IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**

IN RE ESTATE OF GABEL

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

IN RE ESTATE OF CHARLES L. GABEL, DECEASED.

JAMES L. GABEL, APPELLEE,

V.

JOLENE M. JEFFRIES ET AL., APPELLANTS.

Filed July 30, 2019.    No. A-17-1248.

Appeal from the District Court for Cass County: MICHAEL A. SMITH, Judge. Affirmed as modified.

Nicole Seckman Jilek and Robert M. Schartz, of Abrahams, Kaslow & Cassman, L.L.P., for appellants.

John M. Lingelbach, James A. Tews, and Minja Herian, of Koley Jessen, P.C., L.L.O., for appellee.

ARTERBURN and WELCH, Judges.

WELCH, Judge.

## I. INTRODUCTION

Jolene M. Jeffries (Jolene), Jane M. Hill (Jane), Judy A. McMeekin (Judy), Jack C. Gabel (Jack), and Joyce L. Gabel (Joyce), (hereinafter referred to collectively as the Gabel 5), appeal multiple rulings of the Cass County District Court following a jury trial in which the jury found that Charles L. Gabel (Charles) lacked testamentary capacity to sign his will and trust dated December 3, 2014, and that Charles had been unduly influenced to sign the documents. We affirm as modified.

- 1 -

## II. STATEMENT OF FACTS

Charles and Mary Jo Gabel (Mary Jo) had seven children: James L. Gabel (James), Jolene, Jane, Judy, Jack, Joyce, and Jeri L. Wichert (Jeri). James was the oldest child and worked on the farming operation with Charles. Jack helped farm for a couple of years while he was in high school but did not help with the farming operation thereafter. None of the other children were involved in the farming operation to any significant degree.

The farming operation originally consisted of 160 acres, including the family home, and was located near Osceola, Nebraska. In 1972 or 1973, Charles purchased another 80 acres of land. In 1975, after James graduated from high school, Charles rented another 401 acres of farmland. In 1994, James and Charles formed CJ Land and Cattle LLP, for their farming business and, in 2006, formed CJ Feedyard, LLC, for their cattle feeding business. James began handling the finances for the farm in 1996. In 2010, at the request of a lender, Charles and James formed MCGFF, LLC, to serve as a financing entity for their businesses. By 2012 or 2013, the farming operating had grown to 2,402 acres including rented land. James and Charles worked the farming operation together, used each other's equipment, helped each other, and consulted on every major business decision until March 2007 when Mary Jo passed away unexpectedly. Thereafter, Charles sold to James the 10 acres on which the house, farm buildings, and bins were located. Additionally, Charles instructed James that Charles wanted James to have an option to purchase the farmland and equipment upon his death and began to retreat from active farming.

In 2008, Charles executed a trust document in which he gave James the option to purchase certain farmland at its assessed value upon Charles' death. At about the same time, Charles executed a "Statement of Intent" which provided that James had the option to purchase 94 acres formerly owned by Mary Jo which was consistent with Mary Jo's 1996 will. In that statement, Charles provided, in part:

> My son, James L. Gabel has helped me and provided assistance during my farm operation for the past 30 years. In recognition of this contribution to my farming operation over the past 30 years, I have elected to treat my son James L. Gabel, more favorably than my other children. Were it not for his efforts over the past years, I would not have been able to accumulate the estate which he has helped create.

Following Mary Jo's death, Charles became depressed and began to drink heavily until sometime in 2008. In July 2012, Charles was pulled over for driving on the wrong side of the road and ended up losing his driver's license.

Beginning in August 2012, Charles' primary care physician, Dr. Cameron Sidak, performed several mini-mental status examinations (MMSEs) on Charles. A MMSE is a test often administered by primary care physicians to assess mental capability. Another doctor described the test as sensitive to revealing cognitive defects, but not very effective at diagnosing the underlying condition causing the defect. The MMSE test is scored on a 30-point scale. A score below 25 corresponds to dementia; a score below 20 corresponds to moderate dementia; and a score below 10 corresponds to severe dementia. In August 2012, Charles' test resulted in a score of 14. At that time, Dr. Sidak diagnosed Charles with early stage Alzheimer's dementia.

Shortly thereafter, on September 11, 2012, Charles executed a new will with the residue of the estate to be devised to all seven children in equal shares. Charles also executed a new trust in 2012 with the only significant additions consisting of the inclusion of additional property acquired by Charles and the inclusion of a provision intended to ensure compliance with a Natural Resource District directive. Within the trust document, James was named as successor trustee to Charles.

Dr. Sidak continued MMSE testing on Charles and, in December 2012, after Charles starting taking Aricept, a dementia medication, Charles' MMSE test score increased to a 20. In March and November 2013, Charles scored 17 on each of two MMSEs. In January 2014, he scored a 19, which Sidak testified should have been scored as an 18, and in March 2015, he scored a 13.

On July 25, 2013, Charles called Jolene and asked for her assistance in connection with a medical condition. On July 26, Jolene drove Charles to the doctor and proceeded to take him to the office of attorney James Papik (Papik). According to Jeri's testimony at trial, Jolene previously told her that Jolene and Jason Gabel (Charles' grandson) saw Charles' will and trust and were upset about the provisions favoring James. At Papik's office, Charles asked Papik to change his power of attorney from James to Jolene and remove James as successor trustee and name Jolene in his place. After meeting with Papik, Jolene took Charles across the street to Cornerstone Bank where she provided the new power of attorney and amended trust. Jolene testified that in the following weeks after she became Charles' attorney-in-fact, Charles learned that he was in much greater debt than he previously thought. Charles moved in with Jolene following these meetings.

On August 16, 2013, Papik organized a family meeting to discuss Charles' estate plan. The meeting was attended by Charles, Papik, James, Jack, Jolene, and Jeri. At the meeting, Papik discussed Charles' 2012 will and trust, the recent amendment to the trust, and the recent naming of Jolene as Charles' attorney-in-fact. The subject matter of the meeting resulted in a heated exchange between Charles and James and other members of the family. The fracturing of the family continued after the meeting. By November 13, Charles and James got into an altercation at Charles' home which each accused the other of instigating and which was witnessed by Jason. The incident resulted in James being charged with assault and obstruction of a police officer. James pled guilty and was ordered to have no contact with Charles.

By August 2014, Charles again attempted to change his will and trust. In doing so, he expressed his desire to now disinherit James and to leave assets to Jeri's children, bypassing Jeri. The members of the Gabel 5 testified that, among other things, the changes were due to James' attempts to obtain a guardianship, his mishandling of Charles' finances, and his treatment of Charles. Charles' counsel, who had prepared Charles' 2014 will and trust, retained a third party law firm to witness the signing. Counsel testified at trial to the steps counsel utilized to ensure Charles' competency prior to Charles' final execution of the documents which took place on December 3, 2014.

Charles lived with Jolene until March 30, 2015, when he moved to Silver Ridge Assisted Living. During the time that Charles resided with Jolene, James and Jeri testified that Jolene refused to provide them with updates on Charles' health. On April 15, Charles left Silver Ridge to be evaluated at Immanuel Hospital. By May 15, Charles moved to Prairie Meadows Nursing Home and lived there until his death on November 18.

During Charles' stay at Prairie Meadows, Jolene provided Prairie Meadows with photographs of James and Jeri. Jolene instructed the facility that James had a no contact order

legally preventing him from seeing Charles and instructing the staff to call to arrange a supervised visit if Jeri sought to see Charles. At trial, James offered exhibit 259, a September 25, 2015, document which demonstrated Charles' change in care plan and which included photographs and the instructions made by Jolene. Over the Gabel 5's objection, the court accepted the portion of exhibit 260, dated April 7, 2015, which contained Jolene's photos and instruction but not the change in care plan.

### 1. PETITION AND PRETRIAL

On April 18, 2016, James filed a petition for formal probate in the Cass County Court, alleging that Charles' 2012 will was his last will and testament and seeking to be appointed personal representative of the estate. Jolene objected alleging that the 2014 will was valid and was Charles' last will and testament. Jolene sought to have Heritage Bank appointed as personal representative. The case originated in the Cass County Court and was eventually transferred to the Cass County District Court before trial.

In connection with the district court proceedings, the district court issued a Joint Pretrial Conference Order which stated in relevant part:

**D. Consolidated Exhibit List**

Please see the parties' Joint Exhibit List attached as Exhibit C. The first portion of the Exhibit List is James Gabel's and Jeri Wichert's Exhibit List and the second portion of the Exhibit List is Jolene Jeffries' Exhibit List. If no objection is noted to an identified exhibit, then said exhibit shall be considered a "joint" exhibit.

Prior to trial, the Gabel 5 filed a motion in limine. In response to the motion, the court ruled that it would exclude from evidence several of the requested items including:

4. Any witness, expert opinions, testimony or evidence not previously disclosed in discovery consistent with the deadlines set forth in this Court's scheduling order. See, *Paulk v. Cent. Lab. Assocs. P.C.*, 262 Neb. 838, 636 N.W.2d 170 (2001).

. . . .

5. The validity of the Will dated September 11, 2012, the validity of the Trust dated December 28, 2012, or the validity of the Trust dated July 26, 2013. Parties may discuss or offer into evidence the existence of said documents, but not whether said documents are valid.

. . . .

8. To prohibit reference to any testimony, argument, reference or evidence concerning any documents not disclosed prior to trial in this matter, as such documents would constitute an unfair surprise, would be prejudicial to the Gabel 5, and would violate Nebraska Discovery Rules. Neb. Ct. R. Disc. § 6-326; *Norquay v. Union P.R. Co.*, 225 Neb. 527, 407 N.W.2d 146 (1987).

. . . .

10. To prohibit any references to offers to compromise or other offers to settle or settlement negotiations between the parties.

. . . .

13. To prohibit the use of the following documents:

. . . .
      c. Last Will and Testament of Mary Jo Gabel dated Feb. 5, 1996 (Ex 3)
. . . .
      g. Statement of Intent of Charles Gabel dated February 20, 2008 (Ex 9)

The Gabel 5 also requested that the court exclude evidence of Charles' health, mental status, or medical care after January 1, 2015. In response, the court refused to make a general determination of how long after the signing of the will evidence of Charles' mental state would be admissible reserving said determination for the time of trial.

## 2. TRIAL

### (a) Evidence Presented by Gabel 5

At trial, the Gabel 5 asserted that the December 3, 2014, will was Charles' valid will. James and Jeri opposed this assertion and affirmatively alleged that the December 3, 2014, will was not valid because of "undue influence" exerted over Charles. In connection therewith, Michelle Miller-McCoy, an attorney who conducted the meeting where Charles signed his 2014 will and trust, testified that she asked Niel Nielsen, another attorney at her firm, and DeAna Schaffer, a paralegal at her firm to be present when the execution took place. Prior to the execution of the documents, Miller-McCoy testified that she met with Charles and his conservator, Sam Moyer, an employee of Heritage Bank, in order to thoroughly review the documents with them. Miller-McCoy testified that the three went over the provisions of the will and trust "in some detail," and both Moyer and Charles asked questions about it. Miller-McCoy then brought in Nielsen and Schaffer to serve as witnesses to the verification of Charles' testamentary capacity and the actual signing of the documents.

Miller-McCoy testified that she went through a checklist of questions to determine capacity and recorded a yes or no for each question. She testified that she had certain follow up questions rather than just accepting a yes or no answer as final. These follow up questions included asking Charles who his children were and asking him to describe his property. After going through the checklist, she and the other witnesses stepped out and conferred briefly on whether they believed Charles had testamentary capacity. They returned and witnessed the signing of the will. During the Gabel 5's rebuttal case, both Nielsen and Schaffer provided substantially consistent testimonies governing their version of the will's execution.

### (b) James Gabel's Evidence

Following the Gabel 5's completion of their evidence, James adduced testimony from several individuals including himself; Dr. Sidak; Dr. Ty Callahan, a neuropsychologist; and Dr. Deborah Hoffnung, a clinical neuropsychologist.

### *(i) James Gabel*

James testified that he had farmed with his father since shortly after high school. James further testified that, even after Charles retired from active farming James saw him daily, often multiple times daily, and would do office work for the farm at Charles' house. Toward the end of Charles' time living on his own, Charles needed labels on things and sometimes became physically

aggressive. According to James, Charles lived in the house at the farm where he had raised his children "until he was abducted by Jolene" in July 2013.

James testified that when Jolene took Charles to the medical appointment and to change his power of attorney, she also took him to banks where they cut off James' access to various accounts, including accounts partially owned by James. He testified that Jolene's action caused a "domino effect" resulting in James' inability to access money in different entities and conduct business. He testified that Jolene's actions and interference eventually led to a foreclosure and his filing for bankruptcy while he worked to resolve these financial matters.

### (ii) Dr. Cameron Sidak

James played a video deposition of Dr. Sidak for the jury. It included discussions of the care referenced above. In connection with a March 12, 2015, visit, Sidak testified that Charles seemed to be doing about the same as before based on general observations, but scored a 13 on an MMSE. James then offered, and the court received into evidence, exhibit 151, a detailed progress report governing that March 12, 2015, office visit.

### (iii) Dr. Ty Callahan

In May 2014, Dr. Callahan administered a mental examination to determine if Charles should continue to make his own medical decisions. Dr. Callahan testified that his informal mental evaluation revealed that Charles knew Obama was the president, but when given multiple choice answers, he said the previous president was Ronald Reagan. Callahan asked Charles questions about his personal history and noted that Charles appeared to be an unreliable historian.

Callahan also conducted a formal neuropsychological evaluation of Charles. Callahan testified he formally evaluates patients in multiple areas so that their abilities can be ranked against other patients of similar age and gender. For each area, Charles was provided a percentile rank in relation to men his age. Callahan testified that someone at the second percentile is considered moderately impaired, and someone at the first percentile is considered severely impaired. Callahan's testimony and report demonstrated that Charles fell at or below the first percentile in language comprehension, memory in both immediate and delayed assessments, speed of processing, and in three other areas. Charles was ranked in the second percentile for attention span, and was not above the seventh percentile in any area. Based on interactions with Charles and reports from Jolene, Callahan believed that Charles' everyday functional abilities were a relative strength; however, Callahan believed Charles needed help making medical decisions. While his report indicated that Charles would continue to decline, Dr. Callahan did not testify as to Charles' mental abilities following this evaluation.

### (iv) Dr. Deborah Hoffnung

Dr. Hoffnung, testified that, in forming her opinion regarding Charles' mental capacity, she reviewed records from Dr. Sidak including MMSEs that he had administered; a report of neuropsychological testing from Dr. Ty Callahan; documents from SilverRidge, the Heritage Center, and Prairie Meadows. She testified that the documents she reviewed, including those medical records relating to periods of time after the execution date, are relevant to

neuropsychologists in evaluating whether someone has testamentary capacity and were useful in forming her opinion.

In relation to Charles' MMSE test scores, including Charles' documented increase in his August 2012 score of 14 to his December 2012 score of 20, Dr. Hoffnung testified that, because the test is mostly uniform, it is "very prone to practice effects," which means that taking the test a second time can increase a patient's score. She continued by stating that it is a bad sign for a patient's mental abilities if their MMSE score does not increase when the MMSE is administered again. Dr. Hoffnung also testified that a patient's cognitive abilities can increase when he or she starts taking Aricept.

Although Dr. Hoffnung declined to comment on whether it was likely that there was undue influence, she stated that Jolene's care for him and control of Charles' life, as well as his memory problems left Charles highly susceptible to undue influence. Dr. Hoffnung ultimately opined that Charles did not have testamentary capacity when he executed his December 2014 will.

### (c) Gabel 5 Motion for Directed Verdict and Rebuttal Witnesses

At the close of James' evidence, the Gabel 5 moved for a directed verdict, which motion was overruled by the district court. The Gabel 5 then called rebuttal witnesses including Dr. Renee Hudson, Psy.D., a clinical psychologist; Jack Gabel; Jason Gabel; attorney Andrew Huettner; and Sam Moyer, Charles' conservator.

### (i) Dr. Renee Hudson, Psy.D.

Dr. Hudson described the records she reviewed and their significance and testified to a reasonable degree of neuropsychological certainty that Charles had testamentary capacity on the day he signed his will. On cross-examination, she responded to questions about her opinion governing the implications of the March 2015 MMSE without objection.

### (ii) Jack Gabel

Jack testified that he had never heard Charles give James credit for building the farm. On cross-examination, following a sidebar, the court allowed Jack to testify regarding Charles' 2008 "Statement of Intent" and allowed that Statement of Intent to be received into evidence over the Gabel 5's objection.

### (iii) Jason Gabel

Jason, Jack's son and Charles' grandson, testified regarding James' alleged assault on Charles. Following direct examination of Jason by the Gabel 5's counsel, James' counsel asked the following questions during cross-examination:

Q. How is your memory?

A. My memory is great. I read daily . . . every year I have countless certifications with the State of Nebraska.

Q. Have you ever had any medical issues or addiction issues that would impair your memory?

A. No, sir.

[Gabel 5's attorney]: Objection, relevance.

THE COURT: Overruled.

BY [James' attorney]:
Q. What's that?
A. No.
Q. Have you had any addiction problems that might impair your memory?
A. No.
Q. Have you had any addiction problems?
A. No.
Q. Never?
A. No.
Q. You've never had trouble with meth?
A. Nope.
Q. Have you ever used meth?
[Gabel 5's attorney]: Objection, relevance.
THE COURT: Overruled.
BY [James' attorney]:
Q. Have you?
A. Yes.
Q. When was that?
A. High school.
Q. When's the last time you used meth?
A. High school.
Q. Have you ever gotten in trouble for meth?
A. No.
Q. Never been an issue at all?
A. Nope.

Following Jason's testimony, the Gabel 5 called another witness. Following that witness' testimony, the Gabel 5 moved "to exclude all testimony regarding the questions and the answers to Jason Gabel with regards to his prior drug use." The court overruled the objection.

### *(iv) Andrew Huettner*

Huettner, the attorney who drafted Charles estate plan in 2014, testified, in response to inquiries, that when he talked about the will and trust documents with Charles, Charles was able to list his assets and demonstrated an understanding of the distributions. Huettner further testified that Charles told him that he understood that the document he was drafting would control what happened to his assets. Huettner testified that an attorney working with him inquired into whether anyone was exercising influence over Charles which Charles denied.

### *(v) Sam Moyer*

Moyer testified that he worked with James and Charles serving as trustee and conservator for Charles commencing in August 2013. He testified that the farm operation should have made Charles $70,000 each year after property taxes just from owning and renting the land, but that Charles was making almost no money. He testified that, in his opinion, the farm was failing

financially. In order to impeach this testimony, James introduced exhibits 262 and 263, which were financial statements prepared by Heritage Bank from 2015 and 2016 which showed positive equity from operations. In response, the Gabel 5 objected arguing that the documents were irrelevant and had not been previously disclosed to them. The court admitted the documents into evidence.

At the close of all the evidence, the Gabel 5 renewed their motion for directed verdict. The district court again overruled their motion.

During closing arguments, James referred to the jury needing to decide if Charles' 2012 will was valid. The argument is quoted below in the analysis section of this opinion. In response, the Gabel 5 requested a sidebar conference, which the court granted, but neither the contents of the sidebar conference nor any objection to James' argument appears in the record. James also argued that his parents' intent in written wills could be traced back to 1996, a reference to his mother's will, which argument is also quoted below in the analysis section. The Gabel 5 did not object to this argument.

### 3. JURY VERDICT AND MOTION FOR COSTS

The jury found that the Gabel 5 failed to prove by a preponderance of the evidence that Charles' December 3, 2014, will was valid and separately found that Charles was unduly influenced in making that will, thereby rendering it invalid.

On August 29, 2017, James filed a motion for costs which was amended the following day. The court awarded James $9,119.69, a majority of the costs he sought, and the liability was equally apportioned among the Gabel 5. The Gabel 5 appeal from the court's judgment on the verdict and order taxing them with costs.

### III. ASSIGNMENTS OF ERROR

The Gabel 5's assignments of error, consolidated and restated, are that the trial court erred in: (1) in making certain evidentiary rulings; (2) denying their motions for directed verdict, motion for judgment notwithstanding the verdict, and motion for a new trial; and (3) awarding costs in favor of James.

The Gabel 5 also argue that the district court erred in failing to make a verbatim record of at least nine sidebar conferences during the trial. However, they do not assign this as error. Absent plain error, errors argued but not assigned will not be considered on appeal. *In re Estate of Brown-Elliott*, 27 Neb. App. 196, ___ N.W.2d ___ (2019). We find no plain error regarding this claim and accordingly, we will not consider the Gabel 5's argument related to the lack of records in relation to sidebar conferences.

### IV. STANDARD OF REVIEW

Proceedings to determine legal competency and alleged undue influence in a probate context sound in law, and the findings of the trier of fact will not be disturbed unless clearly wrong. *In re Estate of Ellis*, 9 Neb. App. 598, 616 N.W.2d 59 (2000).

A trial court has the discretion to determine the relevancy or admissibility of evidence, and such determinations will not be disturbed on appeal unless they constitute an abuse of that discretion. *Hartley v. Metropolitan Util. Dist.*, 294 Neb. 870, 885 N.W.2d 675 (2016).

In a civil case, the admission or exclusion of evidence is not reversible error unless it unfairly prejudiced a substantial right of the complaining party. *Id.*

An abuse of discretion, warranting reversal of a trial court's evidentiary decision on appeal, occurs when a trial court's decision is based upon reasons that are untenable and unreasonable or if its action is clearly against justice or conscience, reason, and evidence. *Id.*

In reviewing rulings on motions for directed verdict and judgments notwithstanding the verdict, an appellate court gives the nonmoving party the benefit of all evidence and reasonable inferences in his or her favor, and the question is whether a party is entitled to judgment as a matter of law. *First Express Servs. Group v. Easter*, 286 Neb. 912, 840 N.W.2d 465 (2013). Regarding motions for new trial, an appellate court will uphold a trial court's ruling on such a motion absent an abuse of discretion. *Id.*

The decision of a trial court regarding taxing of costs is reviewed for an abuse of discretion. *Mock v. Neumeister*, 296 Neb. 376, 892 N.W.2d 569 (2017).

## V. ANALYSIS

### 1. ALLEGED EVIDENTIARY ERRORS

The Gabel 5 first assign errors to many of the trial court's evidentiary rulings governing the following: (a) allowing evidence of Charles' health and state of mind after December 3, 2014; (b) allowing evidence and/or argument regarding the validity of prior testamentary documents and Mary Jo's 1996 Will; (c) admitting Charles' 2008 "Statement of Intent" into evidence; (d) allowing James' statement offered at the sentencing in his assault case; (e) allowing testimony regarding a witness' drug use; and (f) allowing evidence of financial statements.

#### (a) Charles' Health and State of Mind After December 3, 2014

The primary issue presented in this case was whether Charles had proper testamentary capacity as of December 3, 2014, when he executed his new will and trust and/or whether he was subjected to undue influence in making those documents. As such, the Gabel 5 first argue that the court erred by allowing evidence, testimony, and documents regarding Charles' health months after that date. As noted by the Gabel 5:

> At trial exhibits 151 [medical progress note dated March 12, 2015], 152 [April 13, 2015, medical note -- turning over Charles' care to closer M.D.], 259 [Prairie Meadow change in plan of care dated September 25, 2015, and] 260 [photographs and information provided by Jolene to Prairie Meadows dated April 7, 2015], which all relate to events months after the execution [of Charles' December 2014 will], were received into evidence and Drs. Hoffnung, Sidak, Callahan, and Hudson were permitted to testify regarding Charles' condition of mind long after the December 3, 2014 execution [of his will].

Brief for appellants at 27.

The standard governing the admission of evidence in connection with the execution of a will was set forth in *In re Estate of Schoch*, 209 Neb. 812, 814, 311 N.W.2d 903, 905-06 (1981). wherein the Nebraska Supreme Court stated, "[a]lthough competent evidence of a testator's condition of mind long before, closely approaching, and shortly after the execution of a will is

admissible, it is received only to assist in revealing his state of mind at the time the will was executed."

Here, there was evidence submitted governing Charles' medical condition up to 6 months following the date his December 2014 will was executed. The Gabel 5 argue that evidence was too far removed from the will's execution date and the court abused its discretion in admitting it. The Gabel 5 cite no authority which suggests that evidence 6 months removed from the operative date of consideration is too late and falls outside the "shortly after" period of admissible evidence set forth in *In re Estate of Schoch*. Nor would we expect to find an absolute cutoff date as matters like this vary on a case-by-case basis. Dr. Hoffnung specifically testified that the documents she reviewed, including those medical records relating to periods of time after the execution date, are relevant to neuropsychologists in evaluating whether someone has testamentary capacity and were useful in forming her opinion here. Further, the weight of the evidence is for the trier of fact to determine to arrive at a decision. *Muenchau v. Swarts*, 170 Neb. 209, 102 N.W.2d 129 (1960).

Because our caselaw allows evidence of a testator's state of mind for a period of time following the operative date of determination as it bears on the testator's state of mind on the operative date, and based upon Dr. Hoffnung's testimony that the evidence received was relevant to her determination, we cannot say that the district court abused its discretion in allowing the evidence.

### (b) Prior Testamentary Documents and Mary Jo's 1996 Will

The Gabel 5's next argument centers on the district court's order sustaining the Gabel 5's motion in limine governing the following requested exclusions from evidence:

> 5. The validity of the Will dated September 11, 2012, the validity of the Trust dated December 28, 2012, or the validity of the Trust dated July 26, 2013. Parties may discuss or offer into evidence the existence of said documents, but not whether said documents are valid.
>
> . . . .
>
> 13. To prohibit the use of the following documents:
>
> . . . .
>
> c. Last Will and Testament of Mary Jo Gabel dated Feb. 5, 1996 (Ex 3)

The Gabel 5 argue that, notwithstanding the court's sustaining of their motion regarding this evidence, certain arguments made by James during closing arguments violated the court's order. We first note that "[a] motion in limine is only a procedural step to prevent prejudicial evidence from reaching the jury. It is not the office of such motion to obtain a final ruling upon the ultimate admissibility of the evidence." *State v. Schreiner*, 276 Neb. 393, 407, 754 N.W.2d 742, 755 (2008). Accordingly, in order to properly address this assignment of error, we must review the specific evidence or argument the Gabel 5 assert was not allowable at trial and analyze the trial rulings thereon.

First, the Gabel 5 argue that James, in his closing argument, argued:

> Now, you might be saying, well, didn't he have Alzheimer's? The diagnosis came in August of 2012. This will is a September of 2012 will. Well, guess what. Jolene has filed

an objection to this will and the next jury gets the pleasure, I guess, of deciding whether this one is valid. And if it isn't, it's the 2008 will or a prior will. You're not being asked to decide that, but I want to show you --

At this point, a sidebar conference was held but no ruling or instructions appear as a result thereof. The record does not reflect any objection to James' argument, only a request for a sidebar. A party who fails to make a timely objection to evidence waives the right on appeal to assert prejudicial error concerning the evidence received without objection. *State v. Harris*, 263 Neb. 331, 640 N.W.2d 24 (2002). Neither a defendant's motion in limine nor his renewal of the motion in limine will preserve an issue for appeal when he fails to object at trial when the evidence is introduced. See *State v. Timmens*, 263 Neb. 622, 641 N.W.2d 383 (2002) (because overruling motion in limine is not final ruling on admissibility of evidence and does not present question for appellate review, question concerning admissibility of evidence which is subject of motion in limine is raised and preserved for appellate review by appropriate objection during trial). Because the Gabel 5 did not raise an objection to James' argument at trial, they did not preserve the issue for appeal.

The Gabel 5 next argue that James' counsel argued, "So I would ask that while you're in the jury room, look at these wills and look at how going back for years they favored Jim because of what he said in the Statement of Intent, because of what his mother said back in 1996." They then argue that Mary Jo's 1996 Last Will and Testament was not received into evidence and was excluded pursuant to the district court's order in limine.

The Gabel 5 argue that the argument by James' counsel was in direct contradiction to the order in limine. Again, however, the Gabel 5 did not object to this argument at the time of trial. Having failed to object to the argument, the Gabel 5 did not preserve the issue for appeal.

### (c) Charles' 2008 Statement of Intent

The Gabel 5 refer back to their motion in limine in connection with their next assignment of error. They note the court sustained section 13.g. of their motion which sought to "prohibit the use of" the "Statement of Intent of Charles Gabel dated Feb. 20, 2008." Notwithstanding this ruling, following a sidebar, the court allowed James to ask questions about, and received into evidence, the statement of intent which the court had previously ruled would not be "used" during the proceedings. As we mentioned earlier in the opinion, a motion in limine is a procedural step but does not necessarily create a ruling on the ultimate admissibility of the evidence. *State v. Schreiner, supra*.

Here, following James' offer of the statement of intent into evidence, the Gabel 5 objected but gave the basis for the objection as "Same objections for the last two months, Your Honor." Neb. Rev. Stat. § 27-103 (Reissue 2016) provides:

(1) Error may not be predicated upon a ruling which admits or excludes evidence unless a substantial right of the party is affected, and:

(a) In case the ruling is one admitting evidence, a timely objection or motion to strike appears of record, stating the specific ground of objection, if a specific ground was not apparent from the context; or

(b) In case the ruling is one excluding evidence, the substance of the evidence was made known to the judge by offer or was apparent from the context within which questions were asked.

The specific ground for the Gabel 5's objection was not stated and it is extremely difficult for this reviewing court to understand the context of this objection. In referring to the original motion in limine governing this matter, the Gabel 5 requested that the court "prohibit the use" of the Statement of Intent, item 13.g., without specifying the basis for their objection. We also note that, in its motion in limine order, the court stated:

As to the documents contained described in **paragraph 13**, it is difficult to rule upon the motion without a better understanding of the possible relevance, whether there will be an objection for hearsay or what other circumstances surround the offer of the exhibit. That being said, barring some other showing, the Court will sustain the objection to a, b, c, d, g, h, i[,] n and x. The Court will withhold ruling on the remaining documents.

Based upon this order, it is difficult to know the original basis for the court's ruling, but the court did make clear that the ruling was subject to some other showing.

At trial, the Gabel 5 attempted to argue that part of the reason Charles changed his mind and desired to disinherit James came from the family meeting where Charles criticized James for taking credit for building the farm. During his direct testimony, Jack testified that he had never previously heard his father give credit to James for building the farm. Accordingly, in order to impeach Jack's testimony, James' counsel referred to Charles' 2008 Statement of Intent where Charles specifically credited James for his assistance in building the farm. If the basis for the objection and court's original concern governing this document was its relevance, it became relevant to impeach Jack's testimony. The court foreshadowed the possibility of a showing at trial which would demonstrate the relevance of documents subject to his order. Item 13.g, Charles' 2008 Statement of Intent, became relevant during trial. Accordingly, assuming the basis of the objection was relevance as suggested by the court in its order, the document became relevant and the court did not abuse its discretion in admitting it at trial.

(d) James' Statement Offered at Sentencing in Assault Case

Over the Gabel 5's objections, the court received into evidence a statement provided to the judge at sentencing in James' assault case. The Gabel 5 objected on the basis of relevancy, hearsay, and foundation. In connection with its receipt of this exhibit, the court provided a limiting instruction setting forth that the exhibit was "being received in evidence but does contain statements from other individuals. Those are not being offered to prove that those statements, in fact, are true but offered -- but are still contained within that document for other purposes."

The Gabel 5's only argument in connection with this assigned error is that

the court erred and abused its discretion in admitting Exhibit 84 into evidence. Exhibit 84, coupled with all the other wrongly admitted evidence was highly prejudicial and constitutes reversible error. As a result, the judgment in this case should be vacated and this case should be remanded for a new trial.

Brief for appellants at 32. Although the record specifies that the Gabel 5 objected to exhibit 84 on the basis of relevancy, hearsay, and foundation, the Gabel 5 fail to argue which, if any, of those objections constitutes the basis for their assignment of error. Nor do the Gabel 5 argue why they believe exhibit 84 is not relevant, why it constitutes hearsay, or what foundation was lacking. The brief statement contained in their brief which cites no law in support thereof, and which makes no arguments in support thereof, is insufficient to constitute discussion of the assigned error. See *State v. Reyes*, 18 Neb. App. 897, 794 N.W.2d 886 (2011). An alleged error must be both specifically assigned and specifically argued in the brief of the party asserting the error to be considered by the appellate court. *State v. Sundquist*, 301 Neb. 1006, 921 N.W.2d 131 (2019). Finding no plain error, we decline to discuss this claim which did not receive even minimal argument in the Gabel 5's brief.

(e) Testimony Regarding Witness' Drug Use

Jason was Charles' grandson and testified about the altercation between Charles and James which resulted in an assault charge against James. Jason's version of events was favorable to the Gabel 5, but contrary to James' version of events. Following direct examination of Jason by the Gabel 5's counsel, James' counsel asked the following during cross-examination:

Q. How is your memory?

A. My memory is great. I read daily . . . every year I have countless certifications with the State of Nebraska.

Q. Have you ever had any medical issues or addiction issues that would impair your memory?

A. No, sir.

[Gabel 5's attorney]: Objection, relevance.

THE COURT: Overruled.

BY [James' attorney]:

Q. What's that?

A. No.

Q. Have you had any addiction problems that might impair your memory?

A. No.

Q. Have you had any addiction problems?

A. No.

Q. Never?

A. No.

Q. You've never had trouble with meth?

A. Nope.

Q. Have you ever used meth?

[Gabel 5's attorney]: Objection, relevance.

THE COURT: Overruled.

BY [James' attorney]:

Q. Have you?

A. Yes.

Q. When was that?

- 14 -

A. High school.
Q. When's the last time you used meth?
A. High school.
Q. Have you ever gotten in trouble for meth?
A. No.
Q. Never been an issue at all?
A. Nope.

Later in the proceedings, after Jason was dismissed and following the testimony of another witness, the Gabel 5 moved "to exclude all testimony regarding the questions and the answers to Jason . . . with regards to his prior drug use." In their brief, the Gabel 5 argue that the basis for said motion was Neb. Rev. Stat. §§ 27-404 and 27-609 (Reissue 2016) governing permissible and impermissible bad character evidence and argued that the line of question "was inappropriate, prejudicial, and done for the purpose of discrediting the witness" in violation of these rules. Brief for appellants at 32-33.

As we previously stated, § 27-103 requires a timely objection and requires that objecting party to state the specific ground for the objection. Here, the Gabel 5 timely objected to James' counsel's questions governing whether drug use impacted Jason's memory of events on the basis of relevancy. Counsel did not raise an objection to the basis of the testimony as being impermissible character evidence and improper impeachment by evidence of conviction of crime in violation of §§ 27-404 and 27-609 until long after Jason had been dismissed as a witness.

A party who fails to make a timely objection to evidence waives the right on appeal to assert prejudicial error concerning the evidence received without objection. *State v. Hicks*, 241 Neb. 357, 488 N.W.2d 359 (1992). An objection to the admission of evidence is not timely unless it is made at the earliest opportunity after the ground for the objection becomes apparent. *State v. Rodgers*, 237 Neb. 506, 466 N.W.2d 537 (1991). The Gabel 5 timely objected to the colloquy governing James' use of drugs on the grounds of relevancy, however, they did not timely object on the basis of § 27-404 or § 27-609, or unfair prejudice pursuant to Neb. Rev. Stat. § 27-403 (Reissue 2016) which constitutes a waiver of those objections. See *State v. Bauldwin*, 283 Neb. 678, 811 N.W.2d 267 (2012) (on appeal, defendant may not assert different ground for objection for admission of evidence than was offered at trial).

Thus, the question becomes whether James' counsel's questions governing Jason's use of drugs as it might relate to his perception of events was relevant. "Relevant evidence means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Neb. Rev. Stat. § 27-401 (Reissue 2016). James argues that "[a] party has the right to cross-examine a witness as to anything tending to affect accuracy, veracity, or the credibility of the witness. *Clark v. Smith*, 181 Neb. 461, 465, 149 N.W.2d 425, 429 (1967)." Brief for appellee at 31. We note that the full quotation from *Clark* is:

"The general rule is that a party has no right to cross-examine a witness except as to facts and circumstances connected with matters testified about on his direct examination. . . . However within the meaning of this rule cross-examination is proper as to anything tending to affect the accuracy, veracity, or credibility of the witness. . . . Also where testimony is

- 15 -

given by a witness on direct examination, from which an inference of fact arises favorable to the party producing him, anything within the knowledge of the witness tending to rebut that inference is admissible on cross-examination, and the opposing party is entitled to pursue that line of cross-examination as a matter of right. . . . Again, anything within the knowledge of a witness tending to rebut evidence given on direct examination is admissible as a matter of right on cross-examination."

*Id.* at 465, 149 N.W.2d at 429.

James further cites *State v. Ballew*, 291 Neb. 577, 601, 867 N.W.2d 571, 588 (2015) for the proposition that "[w]hen the object of the cross-examination is to collaterally ascertain the accuracy or credibility of the witness, the scope of the inquiry is ordinarily subject to the discretion of the trial court." We agree that the question here is whether the court abused its discretion in allowing counsel to inquire about Jason's prior drug use as it might impact on the accuracy of his testimony -- an event whose details he was asked to recall 4 years earlier. Certainly prior drug use, including methamphetamine use, can be relevant when the witnesses' memory or mental abilities are legitimately before the court. See *U.S. v. Hodge*, 594 F.3d 614, 618-19 (8th Cir. 2010) ("[p]rior drug abuse may be relevant when the witness's memory or mental abilities are legitimately before the court"). In making this statement, the 8th Circuit cited to *U.S. v. Cameron*, 814 F.2d 403 (7th Cir. 1987). In *Cameron*, the 7th Circuit framed the issues inherent in allowing testimony of this nature in stating:

Evidence that a witness has used illegal drugs may be probative of the witness' "possible inability to recollect and relate," *United States v. Banks,* 520 F.2d 627, 631 (7th Cir.1975). This evidence may be admitted where the memory or mental capacity of a witness is legitimately at issue. *Id.* At the same time, however, there is considerable danger that evidence that a witness has used illegal drugs may so prejudice the jury that it will excessively discount the witness' testimony. *See* Fed.R.Evid. 403. A court must, therefore, be chary in admitting such evidence when it is offered for the sole purpose of making a general character attack. *See Banks,* 520 F.2d at 632; *accord United States v. Sampol,* 636 F.2d 621, 666-67 (D.C.Cir.1980). *See generally,* Annot., *Use of Drugs as Affecting Competency or Credibility of Witness,* 65 ALR 3rd 705 (1975 & Supp.) (collecting cases).

814 F.2d at 405.

Because James' memory of events which transpired 4 years prior to this trial was at issue, we cannot say that Jason's prior use of illegal drugs was completely irrelevant as it relates to his memory of events. That said, because the Gabel 5 did not timely object on §§ 27-403, 27-404, or 27-609 grounds, they waived any argument that the relevancy of the questioning was outweighed by factors set forth in these rules. Under these facts, we cannot say the district court abused its discretion in overruling the relevancy objection.

(f) Evidence of Financial Statements

The Gabel 5 again relate back to their motion and the court's in limine ruling wherein the court sustained the Gabel 5's specific motions to the following:

4. Any witness, expert opinions, testimony or evidence not previously disclosed in discovery consistent with the deadlines set forth in this Court's scheduling order. See, *Paulk v. Cent. Lab. Assocs. P.C.*, 262 Neb. 838, 636 N.W.2d 170 (2001).

. . . .

8. To prohibit reference to any testimony, argument, reference or evidence concerning any documents not disclosed prior to trial in this matter, as such documents would constitute an unfair surprise, would be prejudicial to the Gabel 5, and would violate Nebraska Discovery Rules. Neb. Ct. R. Disc. § 6-326; *Norquay v. Union P.R. Co.*, 225 Neb. 527, 407 N.W.2d 146 (1987).

. . . .

10. To prohibit any references to offers to compromise or other offers to settle or settlement negotiations between the parties.

Based upon the court sustaining the motions as to these three items, the Gabel 5 assign error to the court's admission of financial statements dated November 23, 2015, and February 15, 2016. At trial, the Gabel 5 objected to James' offer of these documents on the basis of relevancy and their claim that the documents were not disclosed prior to use at trial. At trial, James argued that the documents were being offered to impeach Moyer's testimony.

Moyer served as the conservator for Charles prior to Charles' death. During Moyer's testimony, the Gabel 5 obtained testimony from Moyer that, in his opinion, the farming operation was failing financially. The Gabel 5 attempted to utilize this testimony to support their theory that the financial condition of the farm, and Charles' discovery thereof, were one basis for him changing his will to exclude James. During cross-examination, James offered into evidence two financial statements prepared by Moyer which showed calculations governing the financial status of Charles' farming operation on November 23, 2015, and February 15, 2016, respectively. James used the financial statements to demonstrate that the farm showed a positive equity to impeach Moyer's testimony that the farm was failing financially. In that regard, the financial statements were clearly relevant as they showed some indication of the farms' financial picture being inconsistent with Moyer's testimony. The question becomes whether the financial statements were properly disclosed prior to trial as claimed, and objected to, by the Gabel 5.

The Gabel 5's argument on appeal on this issue is short and nonspecific. The Gabel 5 argue that the two financial statements prepared by Moyer were "not disclosed prior to trial or in compliance with the pretrial order" and that "[t]he admission of [the exhibits] also violates the Order in Limine." Brief for appellants at 34. They then argue that admission of these two exhibits amounts to "unfair surprise" and "trial by ambush." *Id*. Although the Gabel 5 do not cite any authority, we interpret their argument to be that the court abused its discretion in overruling their objection to the two financial statements due to James' failure to disclose the documents prior to trial in violation of discovery rules.

Neb. Ct. R. of Discovery 37(b)(2)(B) provides that, upon the failure of a party to comply with an order to provide discovery, the court may sanction the failing party by prohibiting him or her from introducing designated matter in evidence. A court's ruling concerning sanctions will not be disturbed on appeal absent a showing of an abuse of discretion. *Shanko v. Chaloupka*, 239 Neb. 101, 474 N.W.2d 470 (1991). A judicial abuse of discretion exists when a judge, within the

- 17 -

effective limits of authorized judicial power, elects to act or refrain from action, but the selection option results in a decision which is untenable and unfairly deprives the litigant of a substantial right or a just result in matter submitted for disposition to a judicial system. *Kopecky v. National Farms, Inc.*, 244 Neb. 846, 510 N.W.2d 41 (1994).

Here, the Gabel 5 argue that James failed to disclose the financial statements admitted into evidence as exhibits 262 and 263, but they do not include reference in the record to an interrogatory or production request they claim was violated, nor to any order of the court pertaining to a discovery request, nor do we find one. If the basis for their claim is simply that James violated the pretrial order, there is no basis in the order to justly their position. In the "Joint Pretrial Conference Order," the court states in reference to the exhibit list:

### D. Consolidated Exhibit List

Please see the parties' Joint Exhibit List attached as Exhibit C. The first portion of the Exhibit List is James Gabel's and Jeri Wichert's Exhibit List and the second portion of the Exhibit List is Jolene Jeffries' Exhibit List. If no objection is noted to an identified exhibit, then said exhibit shall be considered a "joint" exhibit.

There is no other language in the pretrial order related to the exhibit list and the motion in limine does not reference the exhibit list. Within the exhibit list attached as exhibit C, both parties reserved the right to "offer any exhibit for purposes of impeachment" and "offer any exhibit for purposes of rebuttal." When reviewing the language of the pretrial order we cannot say that the exhibit list was to contain all exhibits to be offered at trial, including exhibits for impeachment or rebuttal. Nor is there any language in the pretrial order or order in limine which restricted the parties to using exhibits only listed on the exhibit list.

Having failed to identify discovery requests or orders which demonstrate noncompliance by James with discovery or language in any order which demonstrates James failed to comply therewith, we cannot say the district court abused its discretion in overruling the Gabel 5's objections to exhibits 262 and 263 for James' failure to disclose said documents prior to trial.

2. DENIAL OF MOTIONS

The Gabel 5 next contend that the district court erred in denying their motions for directed verdict, motion for judgment notwithstanding the verdict, and motion for a new trial.

(a) Denial of Motions for Directed Verdict

The Gabel 5 contend that the district court erred in overruling their motions for directed verdict because (i) James presented insufficient evidence that Charles lacked testamentary capacity and (ii) James presented no evidence to show that Charles was unduly influenced when he executed the 2014 will and trust.

The Gabel 5 first moved for directed verdict at the close of James' evidence and then proceeded to present rebuttal evidence. A party who moves for a directed verdict and, upon the overruling of such motion, proceeds with trial and introduces evidence waives any error in the ruling on the motion for a directed verdict. See *Bridwell v. Walton*, 27 Neb. App. 1, 925 N.W.2d 94 (2019). Because the Gabel 5 proceeded to adduce further evidence after the district court overruled their motion, they have waived any error as to that motion. However, the Gabel 5

renewed their motion for directed verdict at the close of all the evidence, which motion was again overruled by the district court. A directed verdict is proper at the close of all the evidence only when reasonable minds cannot differ and can draw but one conclusion from the evidence, that is, when an issue should be decided as a matter of law. *Denali Real Estate v. Denali Custom Builders*, 302 Neb. 984, 926 N.W.2d 610 (2019). We proceed to consider the Gabel 5's arguments as applied to the district court's overruling of their motion for a directed verdict at the close of all the evidence.

*(i) Testamentary Capacity*

The Gabel 5 first claim that the district court erred in overruling their motion for directed verdict at the close of all the evidence because James presented insufficient evidence that Charles lacked testamentary capacity to execute his 2014 will.

Prima facie proof of a testator's testamentary capacity is established by the introduction of a self-proved will. *In re Estate of Stephens,* 9 Neb. App. 68, 608 N.W.2d 201 (2000). Such prima facie proof is rebuttable with competent evidence to the contrary. *Id.*

The evidence is undisputed that Charles' 2014 will was self-proving; thus, the burden shifted to James to establish that Charles lacked testamentary capacity at the time he signed the will. Pursuant to Nebraska law:

> One possesses testamentary capacity if he or she understands the nature of his or her act in making a will, knows the extent and character of his or her property, knows and understands the proposed disposition of his or her property, and knows the natural objects of his or her bounty. . . . Such capacity is tested by the state of a testator's mind at the time the will is executed.

*In re Estate of Ellis*, 9 Neb. App. 598, 602, 616 N.W.2d 59, 64-65 (2000) (citations omitted).

Here, James adduced evidence from Drs. Sidak, Callahan, and Hoffnung regarding Charles' testamentary capacity. Dr. Sidak diagnosed Charles with moderately severe Alzheimer's on August 13, 2012. Dr. Callahan performed a neuropsychological assessment on Charles 7 months before the 2014 will signing and noted that, in many of the tests, Charles' cognition was significantly impaired with his performance on some tests falling at less than the first percentile. Further, Dr. Hoffnung opined that Charles did not have testamentary capacity on December 3, 2014, when he executed his will. Clearly, James adduced sufficient evidence such that a reasonable mind could conclude that Charles lacked testamentary capacity on December 3, 2014. Accordingly, the district court did not abuse its discretion in denying the Gabel 5's motion for directed verdict at the close of all the evidence.

*(ii) Undue Influence*

Next, the Gabel 5 claim that the district court should have granted their motion for directed verdict at the close of all the evidence because James presented no evidence to show that Charles was unduly influenced when he executed the 2014 will and trust.

> To show undue influence, a will contestant must prove the following elements by a preponderance of the evidence: (1) The testator was subject to undue influence, (2) there was an opportunity to exercise such influence, (3) there was a disposition to exercise such influence, and (4) the result was clearly the effect of such influence. Undue influence

sufficient to defeat a will is manipulation that destroys the testator's free agency and substitutes another's purpose for the testator's. Because undue influence is often difficult to prove with direct evidence, it may be reasonably inferred from the facts and circumstances surrounding the actor: his or her life, character, and mental condition.

*In re Estate of Clinger*, 292 Neb. 237, 248-49, 872 N.W.2d 37, 48 (2015).

Here, the evidence establishes that for 30 years, Charles and James farmed together, sharing equipment, starting corporations and building a small farming operation into a large successful one. In Charles' 2008 statement of intent, he states that he has elected to treat James more favorably due to their long history farming together and James' contributions in helping Charles amass his estate. This continues through Charles' September 2012 execution of a new will and trust. A change in Charles' attitude toward James does not emerge until mid-2013, after Jolene took Charles into her home, became Charles' attorney-in-fact, froze accounts on which James was a co-account owner, and isolated him from James and Jeri. Dr. Hoffnung testified that Jolene's control over Charles' life and the fact that she was his caregiver, combined with Charles' memory problems, left Charles highly susceptible to undue influence. Clearly, James adduced sufficient evidence such that a reasonable mind could conclude that Charles was unduly influenced when he executed his will on December 3, 2014. Accordingly, the district court did not abuse its discretion in denying the Gabel 5's motion for directed verdict at the close of all the evidence.

(b) Denial of Motion for Judgment Notwithstanding Verdict

The Gabel 5 also contend that the district court erred in denying their motion for judgment notwithstanding the verdict. Specifically, they argue that James presented no admissible evidence that Charles did not possess testamentary capacity or that he was unduly influenced when he executed the 2014 will and trust; that wrongly admitted evidence was considered by the jury misleading them to such a degree that it resulted in an unjust verdict not supported by admissible evidence relating to testamentary capacity or undue influence; that the jury was erroneously allowed to consider evidence of Charles' condition of mind well after the December 3, 2014; and they contend that the evidence presented by James was insufficient to establish that Charles was unduly influenced and, "[a]s a result, reasonable minds could only draw one conclusion, that Charles possessed testamentary capacity and was not unduly influenced when he executed the 2014 Will and Trust." Brief for appellants at 41.

On a motion for judgment notwithstanding the verdict, the moving party is deemed to have admitted as true all the relevant evidence admitted that is favorable to the party against whom the motion is directed, and, further, the party against whom the motion is directed is entitled to the benefit of all proper inferences deducible from the relevant evidence. *Hemsley v. Langdon*, 299 Neb. 464, 909 N.W.2d 59 (2018). To sustain a motion for judgment notwithstanding the verdict, the court resolves the controversy as a matter of law and may do so only when the facts are such that reasonable minds can draw but one conclusion. *Id.*

As set forth previously, the facts in this case are such that the jury could reasonably reach the conclusion that Charles lacked testamentary capacity at the time that he executed his will in 2014 and that he was subjected to undue influence. As such, the district court did not abuse its discretion in denying the Gabel 5's motion for judgment notwithstanding the verdict.

- 20 -

(c) Denial of Motion for New Trial

The Gabel 5 also contend that the district court erred in denying their motion for new trial. Specifically, the Gabel 5 contend that "the trial court erred and abused its discretion by admitting certain exhibits and testimony in evidence. The sheer number of inadmissible exhibits clearly misled the jury to the extent that its verdict is not supported by the evidence that was properly admitted." Brief for appellants at 42. Further, although the Gabel 5 make other arguments in their brief regarding why their motion for a new trial should have been granted, these reasons were not raised before the district court. Unless electing to notice plain error, an appellate court does not consider arguments and theories not presented to the lower court. See *Arens v. NEBCO, Inc.*, 291 Neb. 834, 870 N.W.2d 1 (2015).

A motion for new trial is addressed to the discretion of the trial court, whose decision will be upheld in the absence of an abuse of that discretion. *Robinson v. Dustrol, Inc.,* 281 Neb. 45, 793 N.W.2d 338 (2011); *Farm & Garden Ctr. v. Kennedy*, 26 Neb. App. 576, 921 N.W.2d 615 (2018). A motion for new trial should be granted only where there is error prejudicial to the rights of the unsuccessful party. *Hegarty v. Campbell Soup Co.,* 214 Neb. 716, 335 N.W.2d 758 (1983); *Farm & Garden Ctr. v. Kennedy, supra.*

Earlier in this opinion, we addressed the Gabel 5's arguments regarding the admissibility of exhibits and found all of their claims to be without merit. We found that the exhibits were properly admitted, were properly considered by the jury, and the jury's verdict is supported by the evidence as properly admitted. Accordingly, this assignment of error fails.

3. AWARD OF COSTS

The Gabel 5's final assignment of error is that the district court erred in awarding costs in favor of James. Specifically, the Gabel 5 contend that the award of $7,515.88 in expert witness fees and the $490 cost of videotaping an expert witnesses' deposition was erroneous.

James requested costs pursuant to Neb. Rev. Stat. § 25-1711 (Reissue 2016) which provides that "the court may award and tax costs, and apportion the same between the parties . . . as in its discretion it may think right and equitable." Section 25-1711 generally states when a court may tax costs but does not specify what costs are taxable. *City of Falls City v. Nebraska Mun. Power Pool*, 281 Neb. 230, 795 N.W.2d 256 (2011). The Nebraska Supreme Court" has long held that costs of litigation and expenses incident to litigation may not be recovered unless provided for by statute or a uniform course of procedure. *Id*. Applying this principle, the court has held that expert witness fees are not taxable court costs. *Id*. Accordingly, the court abused its discretion in awarding James $7,515.88 in expert witness fees. Further, the fee for videotaping depositions is not taxable as costs under § 25-711. *Id*. Accordingly, we find that the court erred in awarding $7,515.88 in expert witness fees and the $490 cost of videotaping an expert witnesses' deposition. We note that the court's order excluded a payment to CIOX Health and erroneously noted that the amount was $354 instead of the correct amount of $354.66. After making this correction in our calculations, we modify the court's award of fees to award James $1,113.15 in costs which reflects an award of $393 payable to Matheson-Taulborg Reporting; $711.15 payable to Thibault, Suhr & Thibault; $3 payable to the Polk County Court; and $6 payable to the Clerk of the Cass County District Court. As ordered by the district court, the liability for these costs shall by equally apportioned among Jane, Jack, Judy, Joyce and Jolene.

## VI. CONCLUSION

In sum, we affirm the jury's verdict determining that Charles lacked testamentary capacity to sign his will and trust dated December 3, 2014, and that Charles had been unduly influenced to sign the documents. However, we modify the district court's award of costs to James decreasing the award from $9,119.69 to $1,113.15.

AFFIRMED AS MODIFIED.

BISHOP, Judge, participating on briefs.