LYNDA F. PAULK, PERSONAL REPRESENTATIVE OF THE ESTATE OF
GREG W. ANDERSON, DECEASED, APPELLANT AND CROSS-APPELLEE,
v. CENTRAL LABORATORY ASSOCIATES, P.C., ET AL.,
*APPELLEES AND CROSS-APPELLANTS.*
636 N.W.2d 170

Filed November 30, 2001.    No. S-00-109.

Denzel Rex Busick for appellant.

Mark E. Novotny and Kyle Wallor, of Lamson, Dugan & Murray, L.L.P., for appellees.

HENDRY, C.J., WRIGHT, CONNOLLY, GERRARD, STEPHAN, McCORMACK, and MILLER-LERMAN, JJ.

STEPHAN, J.

This is a professional liability action in which Lynda F. Paulk, as the personal representative of the estate of Greg W. Anderson, seeks damages for personal injury and wrongful death. Defendants named in the action include G.L. Morris, M.D.; A.F. Kielhorn, M.D.; and Central Laboratory Associates, P.C. (CLA), a professional corporation with which Morris and Kielhorn were affiliated at all pertinent times (collectively the defendants). Following a trial in the district court for Buffalo County, the jury returned a verdict in favor of the defendants and the district court entered judgment thereon. Paulk appeals from an order overruling her motion for new trial.

## BACKGROUND

On April 17, 1991, Anderson had a mole surgically removed from his back. The surgeon submitted a specimen of the excised tissue to a pathology laboratory operated by CLA, where it was first examined by Morris, a board-certified pathologist. Morris diagnosed the specimen as an "[i]rritated junctional nevus," a type of benign lesion. Kielhorn, who is also a board-certified

pathologist, then independently examined the specimen and concurred with Morris' diagnosis. On April 18, CLA reported the diagnosis reached by Morris and Kielhorn to the surgeon, who, in reliance thereon, notified Anderson that the surgically removed tissue was benign.

On June 17, 1995, Anderson was admitted to St. Francis Medical Center in Grand Island, Nebraska, with complaints of severe back pain, dizziness, vomiting, slurred speech, and headaches. He was thereafter diagnosed as suffering from a metastatic cancerous lesion in his brain, caused by metastatic malignant melanoma. On June 23, in an attempt to determine the primary source of the malignancy, pathologists at St. Francis Medical Center reexamined the specimen slide from the 1991 surgery. They concluded that the specimen was not a benign lesion, as Morris and Kielhorn had concluded, but, rather, a primary nodular malignant melanoma. Anderson's health deteriorated rapidly, and he died as a result of the malignancy on September 11, 1995.

In her operative petition, Paulk alleged that Morris and Kielhorn were negligent in failing to correctly diagnose and report the malignancy in 1991 and that such negligence was attributable to CLA under the doctrine of respondeat superior. She further alleged that

[a]s a direct and proximate result of the negligence of the Defendants, [Anderson] died on September 11, 1995, and his surviving next of kin have been deprived of his care, comfort, companionship, services, earnings, contributions, and consortium, and all other pleasures and rights, having a pecuniary value, which attend inter-family relationships.

In their answer, the defendants admitted that the 1991 diagnosis was incorrect, but specifically denied that they were negligent in any manner and further alleged that "there was no causal relationship between any action or inaction on the part of these defendants in the death of [Anderson], the same being an unavoidable medical sequela of his pathological condition as it there and then existed . . . ."

Prior to trial, the defendants responded to written interrogatories propounded by Paulk. One of the interrogatories directed to each defendant stated:

Identify each person whom defendant expects to call as an expert witness, stating the subject matter on which the expert is expected to testify, the substance of the facts and opinions to which the expert is expected to testify, and a summary of the grounds for each such opinion.

Each defendant identified David Bouda, M.D.; Jerry Jones, M.D.; and David Howe, M.D., as experts whom they had consulted, and responded to the aforementioned interrogatory as follows: "Dr. David Bouda and Dr. David Howe will testify as to causation. Dr. Jones will testify as to causation and standard of care." In supplemental responses, each defendant identified George Bascom, M.D., as an additional defense expert who would testify as to "causation."

After the first of these responses was served, Paulk made a written request by letter for a curriculum vitae for each expert identified and further requested by letter the "facts and opinions upon which each expert is expected to testify." In response, defense counsel wrote:

[E]ach of the . . . expert witnesses . . . will testify, based on a review of the materials in the case . . . that the actions of the defendants were not the proximate cause of [Anderson]'s death. The experts will testify as to the nature of this type of cancer, its curability rate, and the treatments available at the time the decedent suffered from the disease. The experts will further opine regarding the pathology of metastatic melanoma, the disease process itself, and the manner and shape in which the disease manifests itself. Dr. Jones will specifically testify regarding the standard of care regarding the defendants and the difficulty in diagnosing metastatic melanoma. Dr. Jones will testify in detail regarding the process of examining and diagnosing this disease versus other processes of skin samples.

Paulk deposed Jones prior to trial. Jones, a pathologist who practices in Omaha, testified that he reviewed the specimen slide containing tissue from Anderson's 1991 surgery and concluded that it reflected a malignant melanoma. Jones also identified a series of seven photomicrographic slides which he had prepared from the specimen slide, depicting the tissue excised in 1991. When asked why he prepared these slides, Jones stated: "Well, I

may — I would like to offer a caveat that I may have additional things to say about these slides." Paulk's counsel then stated, "I would like to know everything you are going to say about those slides, Doctor[.]" Jones was then questioned and commented upon what was depicted in each of the seven photomicrographic slides. He did not disclose that any of the slides depicted melanoma cells in the blood. After expressing his opinions regarding the applicable standard of care, Jones stated his opinion that the melanoma had already metastasized at the time of Anderson's 1991 surgery. Paulk's counsel then stated, "Tell me all the reasons why you are of that view[.]" Jones discussed "several reasons" but did not mention any detection of melanoma cells in the blood in the 1991 tissue specimen.

At trial, Kris Mleczko, M.D., a board-certified pathologist, was called as an expert witness on behalf of Paulk. Mleczko testified he reviewed a specimen from a scalp lesion biopsy performed during Anderson's 1995 hospitalization and reached a diagnosis of metastatic malignant melanoma, indicating that the malignancy had spread from a distant primary site. In an effort to ascertain the primary site, Mleczko reviewed the tissue specimen from Anderson's 1991 surgery and concluded that it reflected a primary lesion from which the metastatic tumor had originated. He opined that the failure of Morris and Kielhorn to diagnose and report the malignancy in 1991 fell below the applicable standard of care.

Donald Bell, M.D., a board-certified surgeon, also testified as an expert witness on behalf of Paulk. Bell stated that if the malignant melanoma had been diagnosed in 1991, the appropriate treatment would have been a "wide local excision" to surgically remove tissue around and below the scar left by the excision of the mole, as well as postoperative followup care. Bell opined that with such treatment and care, Anderson would have had a greater than 50-percent chance of survival. Bell admitted on cross-examination, however, that patients with *metastatic* melanoma have virtually no chance of survival.

Paulk also offered the deposition testimony of Adour R. Adrouny, M.D., a board-certified oncologist. Based upon a review of medical records, Adrouny testified that if the malignant melanoma had been correctly diagnosed and properly

treated in 1991, Anderson would more likely than not have been alive and free of the disease 5 years later.

In their case in chief, the defendants called, among other persons, Bouda, Jones, Howe, and Bascom, the defense experts previously identified. Bascom and Howe, both board-certified oncologists, testified that in their opinion, the 1991 misdiagnosis was not causally related to Anderson's death because, by that time, the melanoma had already metastasized beyond the skin where it had originated and no treatment could have prolonged Anderson's life. Bouda, another board-certified oncologist, expressed similar opinions. After a hearing outside the presence of the jury, the district court sustained Paulk's motion in limine and excluded Bouda's testimony regarding calculation of tumor growth rates based upon "doubling times" on the ground that this methodology lacked an adequate scientific basis.

On direct examination, Jones gave an opinion that the 1991 diagnosis, while incorrect, did not constitute a deviation from the appropriate standard of care because 100 percent accuracy in pathologic diagnosis is not achievable. He further testified that the lesion had been completely excised in 1991. He was then asked a series of questions concerning images projected from the photomicrographic slides that he prepared from the 1991 specimen slide. When asked what could be seen on one of the images, Jones responded that a melanoma cell could be seen within a blood vessel. He characterized this as "very important" and something he had searched for "very carefully and diligently to try to find." When asked the significance of this finding, Jones stated:

> Well, it [sic] obviously at this stage — at this time when this was excised we have melanoma cells in blood vessels already. We can demonstrate these melanoma cells in blood vessels. What does that mean? That's how melanoma spreads. Melanoma is not like other cancers. It spreads by way of the lymph vessels, and it spreads by the way of the blood vessels. And once it gets in the blood vessels, it goes everywhere. . . . The fact that it's in the blood vessel, it indicates it has already spread systemically to other areas of the body.

Jones further stated his conclusion that "these melanoma cells having been demonstrated in blood vessels have already spread from this site to multiple other areas of the body."

Paulk moved for a mistrial on the ground that the presence of melanoma cells in Anderson's blood as a basis for Jones' opinion regarding the onset of metastasis had not been disclosed in response to pretrial discovery. The district court took the motion under advisement and permitted the trial to proceed. At the conclusion of Jones' testimony, the court questioned him outside the presence of the jury and confirmed that Jones had formed his opinions regarding the presence of melanoma cells in Anderson's blood prior to the taking of Jones' deposition.

Following a brief recess, the trial resumed. On the following day, the defendants rested and Paulk re-called Mleczko to the stand as a rebuttal witness. Mleczko testified that he had obtained the 1991 tissue specimen slide from Jones on the previous evening and had reviewed it again. He also reviewed the photomicrographic slides and Jones' trial testimony in reference to them. Mleczko testified that the photomicrographic slides did not conclusively establish the presence of melanoma cells in the blood and that even if such cells were present, one could not conclude with reasonable medical certainty that the melanoma had metastasized beyond the primary site.

At the conclusion of the evidence, the trial court conducted an instruction conference. The court proposed instruction No. 14, which stated: "A proximate cause is a substantial factor that produces a result in a natural and continuous sequence, *and without which the result would not have occurred.*" (Emphasis supplied.) Paulk objected to the italicized portion of the instruction and requested an instruction on concurring cause. Paulk also objected to instruction No. 8 insofar as it defined Anderson's "next of kin" as his surviving spouse and children. The court overruled the objections and declined to give the requested instruction.

The jury returned its verdict for the defendants on November 12, 1999. On November 15, the district judge filed a journal entry overruling Paulk's motion for mistrial, stating:

> The Court is in agreement that the testimony of Dr. Jones constituted surprise and the type of opinion expressed by Dr. Jones should have been but was not previously disclosed by

the defendants to the plaintiff. The Court finds further, however, that the provision of opportunity to the plaintiff to offer additional evidence contrary to the evidence offered by Dr. Jones was sufficient to remedy the difficulties raised by the plaintiff's motion.

In the same journal entry, the district court accepted and entered judgment upon the verdict.

Paulk filed a timely motion for new trial on multiple grounds, including the overruling of her objections to jury instructions, the refusal of the court to give certain requested jury instructions, and the refusal to grant the motion for mistrial based upon unfair and prejudicial surprise arising from Jones' testimony. Following an evidentiary hearing on this motion, it was overruled. Paulk then perfected this timely appeal, which we removed to our docket on our own motion pursuant to our authority to regulate the dockets of the appellate courts of this state. See Neb. Rev. Stat. § 24-1106(3) (Reissue 1995).

## ASSIGNMENTS OF ERROR

Paulk contends, restated and summarized, that the district court erred in (1) declining to grant her motions for mistrial and new trial based upon unfair surprise; (2) overruling her objection to jury instructions Nos. 8 and 14; and (3) refusing to give a concurring cause instruction.

The defendants have cross-appealed, asserting that the district court abused its discretion in sustaining the motion in limine and precluding the testimony of Bouda with respect to "doubling times."

## STANDARD OF REVIEW

█ A motion for mistrial is directed to the discretion of the trial court, and its ruling will not be disturbed on appeal absent a showing of abuse of that discretion. *Nichols v. Busse*, 243 Neb. 811, 503 N.W.2d 173 (1993).

█ To establish reversible error from a court's failure to give a requested instruction, an appellant has the burden of showing that (1) the tendered instruction is a correct statement of the law, (2) the tendered instruction is warranted by the evidence, and (3) the appellant was prejudiced by the court's failure to give the requested instruction. *Nebraska Nutrients v. Shepherd*, 261 Neb.

723, 626 N.W.2d 472 (2001); *Austin v. State Farm Mut. Auto. Ins. Co.*, 261 Neb. 697, 625 N.W.2d 213 (2001). Whether a jury instruction given by a trial court is correct is a question of law. *Maxwell v. Montey, ante* p. 160, 631 N.W.2d 455 (2001).

■ A motion for new trial is addressed to the discretion of the trial court, whose decision will be upheld in the absence of an abuse of that discretion. *Maxwell, supra.*

## ANALYSIS

### UNFAIR SURPRISE

It is undisputed that Morris and Kielhorn missed the diagnosis of malignant melanoma when reviewing the tissue specimen submitted after the 1991 surgery. At trial, the two critical issues of fact pertaining to liability were (1) whether the missed diagnosis constituted a deviation from the applicable standard of care and (2) if so, whether the missed diagnosis was the proximate cause of Anderson's injuries and death. The causation issue turned on whether the cancer had already metastasized, i.e., spread to other parts of the body, by the time the mole was excised in 1991. There was sharply conflicting evidence on this point.

Whether a causal relationship existed between the misdiagnosis and the metastasis of the primary tumor is a complex medical issue requiring expert testimony. See *Doe v. Zedek*, 255 Neb. 963, 587 N.W.2d 885 (1999). Accordingly, an important aspect of each party's trial preparation was discovery of the opinions that the opposing party's expert witnesses would state at trial and the facts upon which such opinions were based.

■ The primary purpose of the discovery process is to explore all available and properly discoverable information to narrow the fact issues in controversy so that a trial may be an efficient and economical resolution of a dispute. *Phillips v. Monroe Auto Equip. Co.*, 251 Neb. 585, 558 N.W.2d 799 (1997); *Norquay v. Union Pacific Railroad*, 225 Neb. 527, 407 N.W.2d 146 (1987). The discovery process also provides an opportunity for pretrial preparation so that a litigant may conduct an informed cross-examination. *Id.* Moreover, pretrial discovery enables litigants to prepare for a trial without the element of an opponent's tactical surprise, a circumstance which might lead to a result based more on counsel's legal maneuvering than on the merits of the case. *Id.*

Neb. Ct. R. of Discovery 26(b)(4)(A)(i) (rev. 2000) provides:

A party may through interrogatories require any other party to identify each person whom the other party expects to call as an expert witness at trial, to state the subject matter on which the expert is expected to testify, and to state the substance of the facts and opinions to which the expert is expected to testify and a summary of the grounds for each opinion.

Rule 26(b)(4)(A)(ii) provides that upon motion, the trial court "may order further discovery by other means." Here, it appears that the parties informally agreed to identify each expert witness and the general nature of his or her testimony through answers to interrogatories, and then to voluntarily tender the expert for a discovery deposition to be taken by opposing counsel. We therefore view the interrogatory response regarding Jones' testimony and his subsequent discovery deposition testimony as components of the defendants' initial response to expert witness discovery.

Jones' opinion that malignant melanoma cells were visible within the blood vessels in the 1991 tissue specimen, thereby establishing that metastasis had already occurred, was clearly within the scope of the expert witness interrogatory propounded by Paulk. In addition, the information should have been disclosed by Jones in his deposition when he was asked to disclose all of his anticipated testimony concerning the photomicrographic slides, and again when he was asked to give all the reasons for his opinion that metastasis had occurred prior to the 1991 surgery. Jones' own testimony at trial underscores that the presence of melanoma cells in the bloodstream would be a "very important" factor in determining when metastasis occurred.

The record is unclear as to exactly when the defendants or their counsel became aware of this evidence, but that fact is immaterial to our analysis. It is ultimately a party's responsibility to ensure that the party's experts have fairly and adequately responded to an opposing party's deposition questions. Rule 26(e)(1) provides:

A party is under a duty seasonably to supplement his or her response with respect to any question directly addressed to

. . . .

(B) the identity of each person expected to be called as an expert witness at trial, the subject matter on which he or

she is expected to testify, and the substance of his or her testimony.

The record clearly indicates that the defendants failed to supplement prior discovery responses regarding Jones' testimony that in his opinion, melanoma cells could be detected in Anderson's bloodstream. Pursuant to rule 26(e)(1)(B), such critical evidence should have been disclosed prior to trial, and consequently, we agree with the district court that its disclosure for the first time at trial constituted surprise.

Failure to seasonably supplement discovery responses may be grounds for sanctions imposed under Neb. Ct. R. of Discovery 37(d) (rev. 2000). *Norquay v. Union Pacific Railroad,* 225 Neb. 527, 407 N.W.2d 146 (1987). An appropriate sanction under rule 37 is determined in the factual context of a particular case and is initially left to the discretion of the trial court. *Norquay, supra.*

In *Norquay,* we held that a party claiming unfair surprise due to the admission of evidence at trial which was not disclosed in response to discovery requests must make a timely request for an appropriate remedial measure, such as a motion to strike, a motion for a continuance, or a motion for a mistrial. Here, Paulk made a timely motion for mistrial when suddenly confronted with Jones' previously undisclosed opinion that malignant cells were visible in the bloodstream on the 1991 tissue specimen. A motion for mistrial is appropriate when an event occurs during the course of a trial which is of such a nature that its damaging effects would prevent a fair trial. *State v. Borchardt,* 224 Neb. 47, 395 N.W.2d 551 (1986), *overruled in part on other grounds, State v. Baue,* 258 Neb. 968, 607 N.W.2d 191 (2000).

Based upon our review of the record, we conclude that the district court abused its discretion in denying Paulk's motion for mistrial. We reach this conclusion for three reasons. First, Jones' testimony concerning the presence of melanoma cells in the bloodstream was perhaps the most critical evidence offered by the defense. If believed by the jury, the testimony provided objective, tangible proof that the malignancy had already spread at the time of the 1991 surgery. This fact would convincingly refute Paulk's liability theory that the misdiagnosis prevented prompt treatment which would have averted metastasis and death. The critical

importance of the evidence intensified the unfairness occasioned by the failure to disclose it during discovery.

Second, the surprise introduction of this testimony, coupled with the district court's reservation of a ruling on the timely motion for mistrial, placed Paulk in the unenviable position of cross-examining Jones with respect to damaging medical evidence which was disclosed for the first time during trial. This thwarted one of the essential purposes of discovery, which is to provide a basis for an informed cross-examination. See *Norquay, supra.*

Third, the fact that Paulk was permitted to present rebuttal testimony did not eliminate or ameliorate the prejudice occasioned by the unfair surprise. Paulk would have been entitled to present rebuttal evidence even if Jones' opinion had been disclosed during discovery, as it should have been. Timely pretrial disclosure, however, would have permitted Paulk a reasonable period of time in which to develop such rebuttal evidence. Instead, Paulk had approximately 24 hours to arrange for the 1991 tissue specimen to be transported from Jones' office in Omaha to Mleczko's office in Grand Island, so that Mleczko could review it again in light of Jones' trial testimony. Counsel had only a limited time to confer with Mleczko prior to his rebuttal testimony. In an affidavit submitted in support of Paulk's motion for new trial, Mleczko stated that he had inadequate time to examine the specimen slide prior to his rebuttal testimony and therefore had to qualify his opinions. The belated disclosure also denied Paulk the opportunity to have her expert in the courtroom during Jones' testimony in order to visualize the areas on the projected photomicrographic slide which Jones identified as melanoma cells within the blood.

For these reasons, we conclude that Jones' trial testimony regarding his previously undisclosed opinion that melanoma cells were present in Anderson's blood in 1991 resulted in unfair and prejudicial surprise. The district court abused its discretion in denying Paulk's motions for mistrial and new trial.

### JURY INSTRUCTIONS

Because we are remanding this cause for a new trial for the reasons stated above, we need not reach the assigned errors

pertaining to jury instructions. However, an appellate court may, at its discretion, discuss issues unnecessary to the disposition of an appeal where those issues are likely to recur during further proceedings. *Schafersman v. Agland Coop, ante* p. 215, 631 N.W.2d 862 (2001); *Daniels v. Allstate Indemnity Co.*, 261 Neb. 671, 624 N.W.2d 636 (2001). We do not address the assigned errors pertaining to the proximate cause instruction that was given, or the requested concurring cause instruction, because the question of whether such instructions should be given will depend upon the evidence adduced at the retrial. Nevertheless, Paulk's contention that the phrase "next of kin" was incorrectly defined in instruction No. 8 presents a question of law that is likely to recur on retrial, so we address it here.

Jury instruction No. 8 stated:

> The plaintiff Lynda F. Paulk is suing in this case as the personal representative of the Estate of Greg W. Anderson and *for the benefit of the decedent's next of kin who are his surviving spouse, Connie E. Anderson, and his children Jaden Anderson and Latisha Trump.* It is the decedent's next of kin who are the persons who will receive the benefits of any recovery you may find.

(Emphasis supplied.) Paulk asserts on appeal that the italicized portion of the instruction is too restrictive in that "next of kin" should also include the sibling and parents of Anderson.

The right to maintain an action for wrongful death did not exist under the common law and exists in Nebraska, as in other states, solely by statute. *Smith v. Columbus Community Hosp.*, 222 Neb. 776, 387 N.W.2d 490 (1986). The cause of action is authorized by Neb. Rev. Stat. § 30-809 (Reissue 1995). The damages that may be recovered and the disposition of the avails of any judgment obtained are defined by Neb. Rev. Stat. § 30-810 (Reissue 1995). Section 30-810 provides that a wrongful death action shall be brought by the personal representative "for the exclusive benefit of the widow or widower and next of kin" and that the avails of a judgment in a wrongful death action "shall be paid to and distributed among the widow or widower and next of kin in the proportion that the pecuniary loss suffered by each bears to the total pecuniary loss suffered by all such persons."

In *Mabe v. Gross,* 167 Neb. 593, 94 N.W.2d 12 (1959), we construed the phrase "next of kin" as used in § 30-809 to mean persons nearest in degree of blood surviving, or, in other words, those persons who take the personal estate of the deceased under the statutes of distribution. See, also, *Reiser v. Coburn,* 255 Neb. 655, 587 N.W.2d 336 (1998). In *Mabe,* we held that where the deceased was survived by a daughter and his parents, the daughter was the next of kin under the wrongful death statute but the parents were not. Applying this rule, the next of kin in the present case would include the surviving spouse and children of Anderson, but not his parents or his sibling.

While acknowledging the controlling authority of *Mabe,* Paulk suggests that we reexamine that case for several reasons. First, she argues that our interpretation of the phrase "next of kin" in *Mabe* runs afoul of Neb. Const. art. I, § 13, which provides, "All courts shall be open, and every person, for any injury done him or her in his or her lands, goods, person, or reputation, shall have a remedy by due course of law and justice administered without denial or delay . . . ." This argument misconstrues the scope of this constitutional provision. In *Muller v. Nebraska Methodist Hospital,* 160 Neb. 279, 288, 70 N.W.2d 86, 91 (1955), *overruled on other grounds, Myers v. Drozda,* 180 Neb. 183, 141 N.W.2d 852 (1966), we stated that

> [article I, § 13,] of the [Nebraska] Constitution does not create any new rights but is merely a declaration of a general fundamental principle. It is a primary duty of the courts to safeguard this declaration of right and remedy but where no right of action is given or remedy exists, under either the common law or some statute, this constitutional provision creates none.

The cause of action created by § 30-809 is purely a statutory remedy which may be enlarged, reduced, or completely eliminated at the pleasure of the Legislature. Where a statute has been judicially construed and that construction has not evoked an amendment, it will be presumed that the Legislature has acquiesced in the court's determination of the Legislature's intent. *Creighton St. Joseph Hosp. v. Tax Eq. & Rev. Comm.,* 260 Neb. 905, 620 N.W.2d 90 (2000); *Parnell v. Good Samaritan Health Sys.,* 260 Neb. 877, 620 N.W.2d 354 (2000). Thus, there is no

constitutional basis for expanding the wrongful death remedy to persons who do not fall within the statutory classification of "next of kin," as that phrase has been construed by this court.

Paulk also argues that the statutes of descent and distribution in effect at the time of *Mabe, supra,* were repealed and recodified in 1974. See 1974 Neb. Laws, L.B. 354 (operative January 1, 1977). While that is true, it does not compel a departure from the rule announced in *Mabe* because there has been no substantive change in the applicable law. In *Mabe,* we noted that it is only when there is no child of the deceased or descendants of a deceased child that property descends to the parents of the deceased. The same is true under present law. See Neb. Rev. Stat. §§ 30-2301 through 30-2303 (Reissue 1995).

Paulk invites us to abandon the holding in *Mabe v. Gross,* 167 Neb. 593, 94 N.W.2d 12 (1959), for the "modern and enlightened" approach, brief for appellant at 34, taken by the Michigan Supreme Court in *Crystal v Hubbard,* 414 Mich. 297, 324 N.W.2d 869 (1982), which interpreted the phrase "next of kin" in a wrongful death statute to encompass any potential heir of the deceased who could prove a pecuniary loss. We decline to do so because we conclude that any expansion of the class of persons entitled to recover under the wrongful death statutes falls within the province of the Legislature. We therefore conclude that instruction No. 8 was a correct statement of the law.

CROSS-APPEAL

The defendants' cross-appeal presents the single issue of whether the district court erred in excluding portions of Bouda's testimony regarding cancer growth rates as calculated through doubling times on the ground that the testimony lacked a scientific basis. At the time of trial, Nebraska followed the "general acceptance" test for the admissibility of expert testimony concerning scientific evidence, set forth in *Frye v. United States,* 293 F. 1013 (D.C. Cir. 1923). See *Phillips v. Industrial Machine,* 257 Neb. 256, 597 N.W.2d 377 (1999) (Gerrard, J., concurring). We have subsequently held that for trials commencing on or after October 1, 2001, the admissibility of such testimony should be determined under the standards set forth in *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 113 S. Ct.

2786, 125 L. Ed. 2d 469 (1993). *Schafersman v. Agland Coop, ante* p. 215, 631 N.W.2d 862 (2001). We therefore do not reach the issue presented in the cross-appeal because the admissibility of any scientific evidence offered on retrial of this case will be governed by the *Daubert* standards adopted in *Schafersman*.

## CONCLUSION

For the reasons above, we conclude that the trial court did not err in defining "next of kin" in instruction No. 8. However, we conclude that the court did err in not granting Paulk's motions for mistrial and for new trial on the ground that Jones' trial testimony with respect to matters requested but not disclosed in discovery resulted in unfair and prejudicial surprise that deprived Paulk of a fair trial. Because of this error, we reverse, remand for a new trial, and do not reach the remaining assignments of error.

AFFIRMED IN PART, AND IN PART REVERSED AND REMANDED FOR A NEW TRIAL.