IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**

IN RE ESTATE OF LOWE

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

IN RE ESTATE OF ROBERT B. LOWE, DECEASED.

BARBARA LOWE KUNCL, APPELLANT,

V.

ALLEN L. FUGATE, APPELLEE.

Filed March 9, 2021.    No. A-20-412.

Appeal from the District Court for Lincoln County: MICHAEL E. PICCOLO, Judge. Affirmed.

Timothy P. Brouillette, of Brouillette, Dugan, Troshynski & Bellew, P.C., L.L.O., for appellant.

Bradley D. Holbrook and Elizabeth J. Klingelhoefer, of Jacobsen, Orr, Lindstrom & Holbrook, P.C., L.L.O., for appellee.

PIRTLE, Chief Judge, and MOORE and ARTERBURN, Judges.

MOORE, Judge.

## I. INTRODUCTION

Barbara Lowe Kuncl (Kuncl) appeals from the order of the district court for Lincoln County, which granted summary judgment in favor of Allen L. Fugate (Fugate), the personal representative (PR) of the estate of Robert B. Lowe (Lowe), deceased. Kuncl, who is Lowe's niece, challenged the probate of Lowe's will, which was drafted by Fugate. On appeal, she challenges the court's findings that Lowe had the requisite testamentary capacity to execute his will and that he was not subject to undue influence. She also challenges the court's exclusion of certain evidence as a discovery sanction. Finding no error, we affirm.

- 1 -

## II. BACKGROUND

Lowe was a long-time resident of North Platte, Nebraska, and an active volunteer in the community, including serving on North Platte's Salvation Army's board. Lowe never married and never had any children, and he was employed primarily as a realtor.

Lowe's brother was also a long-time North Platte resident, was employed as an attorney, and had one child, Kuncl. Kuncl was 77 years old at the time of her deposition in April 2019; she left North Platte when she was in her early 20s and had been living in Florida for the past 22 years. Prior to that, she lived in Ohio. Kuncl has one child, Kristine Beall (Beall), who lives in Ohio. Beall has one child, Jeffrey Montgomery (Montgomery), who was attending college in Chicago, Illinois, at the time of Beall's deposition in this case. Neither Beall nor Montgomery has ever lived in North Platte.

Fugate is an attorney licensed in Nebraska, and he has practiced in North Platte since 1982. His practice areas have included estate planning and the probate of decedent's estates and probate-related litigation. Fugate had known Lowe since approximately 1975. Fugate was aware of Lowe's connection to various charitable boards upon which Lowe served.

Fugate drafted a will for Lowe dated June 3, 2015, in which Lowe named Fugate as his PR. The 2015 will states that Lowe was revoking all prior wills and codicils made by him and gave all of his "tangible personal property of every nature and wherever situated" as well as "the rest, residue and remainder of [Lowe's] estate, real, personal and mixed, wherever situate[d]," to "the Salvation Army North Platte." In the section entitled "FAMILY INFORMATION," the will states that Lowe was single, had no children, and had "a niece and nephew who are the children of my deceased brother" and specifies that Lowe had not "made any provision in this Will for them as my brother . . . adequately provided for them." In Kuncl's deposition, she acknowledged that after her parents died in 1996, she inherited substantially all of their assets with Beall and Montgomery receiving "a small amount" from Donald's estate. In Fugate's affidavit admitted in the summary judgment proceedings, Fugate states that the reference in the will to Montgomery as being Lowe's "nephew" was a scrivener's error, also indicating that Lowe had confirmed to him that Kuncl was his brother's daughter, that Beall was Kuncl's daughter, and that Montgomery was Beall's son. Lowe was 89 years old when he died on November 1, 2017.

On November 6, 2017, Fugate filed an application seeking informal probate of will and informal appointment of PR in the Lincoln County Court, and he subsequently was appointed and accepted appointment as PR. Kuncl objected and filed a petition to set aside the informal probate and sought supervised administration of the estate. This pleading was subsequently dismissed pursuant to a motion to dismiss filed by Fugate and to a joint stipulation of the parties. On January 23, 2018, through legal counsel, Fugate filed a petition, seeking formal probate of the will, a determination of heirs, and appointment of PR; he again was appointed and accepted appointment as PR.

On February 6, 2018, Kuncl filed an objection to the formal probate petition. She alleged that Lowe was "susceptible to the exercise of undue influence because of his advanced age and physical and mental condition" and that the execution of his will "was caused by the exercise of undue influence by one or more beneficiaries named" in the will. Alternatively, she alleged that

Lowe lacked sufficient testamentary capacity to execute the will. On October 22, Kuncl filed a notice of transfer, and the case was transferred to the district court.

In July 2018, Kuncl responded to written interrogatories from Fugate, which included a specific request that she disclose experts that she expected to call at trial, the subject matter to which the expert was expected to testify, the qualification of each expert, the substance of facts and opinions to which the experts were expected to testify, and a summary of the grounds for each opinion. Kuncl answered that her attorney had not made a final determination as to which experts would testify at trial, but she stated that "[o]nce this determination has been made, counsel for [Kuncl] will supplement this answer to Interrogatory." Then at Kuncl's deposition taken in April 2019, in response to an inquiry from Fugate's counsel as to whether Kuncl had retained an expert in the case, Kuncl stated, "I haven't. No." At that point, Kuncl's counsel stated, "I think for the record we have consulted -- Have not received any reports, but we have consulted with Dr. Lee Kimzey in town." Kuncl's counsel also stated, "He has not reviewed anything as of yet concerning this case."

On January 2, 2020, Fugate filed a motion for summary judgment and an index listing the evidence in support of the motion.

A summary judgment hearing was held before the district court on January 27, 2020. The court accepted the exhibits offered by Fugate, including various pleadings, a copy of Lowe's 2015 will, an affidavit from Fugate, and various depositions. The court also accepted the deposition of a long-time acquaintance of Lowe's offered by Kuncl. Fugate objected to Kuncl's offer of an affidavit of her expert, Kimzey, because Kuncl had not filed an index of evidence as required by Neb. Ct. R. § 6-1526 (rev. 2018), the affidavit had not been not timely served pursuant to Neb. Rev. Stat. § 25-1332 (Cum. Supp. 2020), and Kimzey was not disclosed in discovery as requested. Fugate also objected on the grounds of relevance, reliability, foundation, and lack of an actual opinion contained within the affidavit and argued that the affidavit accordingly was not admissible under Neb. Rev. Stat. § 27-702 (Reissue 2016) as an expert opinion. The court took the objections under advisement, and it ultimately excluded the affidavit from evidence.

Dr. Jeffrey Brittan had been Lowe's primary care doctor for several years, beginning in approximately 2004 and continuing until Lowe's death in November 2017. Brittan described Lowe's health overall as "pretty good." Lowe was diagnosed with lymphoma in October 2004, but he had reached remission status by October 2005. In subsequent followup appointments, Lowe's oncologist noted that Lowe was fairly active at age 79 and walked approximately 2 miles a day.

Brittan's medical records for Lowe do not show any treatment from 2010 to 2015. Brittan did not know of Lowe seeking medical treatment from any other doctor during this period and testified that he always believed he was Lowe's primary healthcare doctor. Brittan believed that the gap was due to Lowe not having to be seen, explaining that he was provided with Lowe's medical records from third parties, including Lowe's oncologists, hospitals, and nursing home/assisted living facilities for coordination of care.

Brittan testified that Lowe became physically weak as he aged but that he did not notice any issues with Lowe "from a mental standpoint." Brittan did not have any concerns about Lowe's vision after he had cataract surgery in March 2010. Lowe was approved to drive after a physical in March 2016 when Brittan characterized Lowe's heath as "pretty good." Lowe was admitted to

the hospital in May and again in June 2017 for pneumonia. During followup appointments, Brittan found that Lowe was a little weak and recovering from his admission to the hospital but Brittan did not find him to be confused. Brittan explained that any noted confusion by hospital staff during the admissions would have been resolved by the time of Lowe's followup appointments with Brittan. He further testified that any such confusion noted by hospital staff would be typical of a hospitalized 89-year-old man, recovering from pneumonia.

By July 2017, Lowe had fallen and was living in a nursing home. Brittan started Lowe on "some breathing treatments" due to increased leg swelling and edema. In August, Lowe was admitted to the hospital for frequent falls due to weakness in his legs. Although Lowe was physically weak, Brittan did not have any concerns about Lowe's mental capabilities. Lowe had an appointment with Brittan on August 18, 2017, due to "just not feeling good." Brittan testified that Lowe's only medications at the time were Vicodin and Albuterol, which Brittan characterized as "pretty darn good for an 89-year-old." By September, Brittan had prescribed additional medication to reduce fluid due to Lowe's continued problems with edema. From approximately September through his death in November, Lowe had congestive heart failure. Brittan testified that congestive heart failure does not have much, if any, impact on someone's mental acuity as long as they are still oxygenating. Brittan had two appointments with Lowe in September and another two in October for additional edema and swelling. October 13, 2017 was the last time Brittan saw Lowe prior to his death.

Brittan testified that over the course of his treatment of Lowe, he did not observe Lowe to have any mental issues and that he never had any concerns regarding Lowe's mental capabilities. Specifically, Brittan did not have any question regarding Lowe's competency on or about June 3, 2015. Brittan testified that he never felt the need to perform a dementia screening on Lowe. Brittan also testified that he never observed anything to make him believe that someone could get Lowe to do anything that he did not want to do. Brittan did not believe that Lowe could be easily swayed or that his will could be suppressed by another.

In her deposition, an individual who had been Lowe's neighbor since 2004 testified about Lowe's health, mental abilities, and daily activities. She characterized their relationship as that of "good neighbor[s]" who were "really close" and visited one another regularly. From May or June 2015 through 2017, the neighbor arrived at Lowe's house at 7:30 a.m. on weekdays, and she assisted him with personal tasks such as getting dressed, cleaning house, and doing laundry. She also provided transportation for Lowe to his office and on errands both work-related and personal. She occasionally took him to medical appointments. The neighbor provided assistance for Lowe on the weekends as well.

With respect to Lowe's mental status, the neighbor testified that since she had known him, Lowe always retained his mental acuity and was very aware of the property he owned, his finances, and details of past and present business transactions. During all of her contact with Lowe, the neighbor never observed anything that caused her to believe that Lowe did not know who he was, what he owned, or who other people were. She also testified about Lowe's love for the North Platte community and was not surprised that he left his estate to the Salvation Army, indicating that Lowe had told her "quite a while before he passed" that he had a will and that the Salvation Army was a beneficiary. According to the neighbor, Lowe never talked to her about a previous will drafted for

him by his brother. The neighbor had never met Kuncl prior to Lowe's passing, but she was aware that Kuncl would "[s]ometimes" call Lowe on Thursdays and "talk for a very few minutes on the phone to him," although she was not aware of the content of those phone conversations.

Fugate's affidavit about his contact with Lowe with respect to the will was admitted into evidence and, in addition to information set forth above, reveals the following. On June 3, 2015, Lowe presented himself at Fugate's office, and he told Fugate he had come in to make a will. Fugate discussed the purpose and effect of making a will with Lowe as well as what Lowe's estate included and who his living relatives were. Lowe made it clear to Fugate that he wanted the Salvation Army to receive his estate because his only living descendants were those of his deceased brother, specifically Kuncl, Beall, and Montgomery, as his brother "had well cared for [Kuncl]." Additionally, Lowe's desire was to benefit the people of Lincoln County, Nebraska, through the services provided by the local Salvation Army. Lowe told Fugate what assets he had, including various real estate properties he owned in Lincoln County, bank accounts in most banks in North Platte, including Wells Fargo, and 8,000 shares of Union Pacific Railroad Company stock held at Edward Jones. Based upon Fugate's conversation with Lowe on June 3, 2015, Fugate drafted a will that same day. After Fugate drafted the will, he discussed its terms with Lowe, who read the will and indicated it met with his approval. Lowe did not have any questions or concerns about the will that was drafted, and he then executed the 2015 will.

In his affidavit, Fugate attested to his belief that on June 3, 2015, Lowe had sufficient testamentary capacity to execute the will. Fugate also stated he was not aware of any facts that would give rise to anything that would constitute fraud, duress, undue influence, or coercion. Fugate stated that he advised the Salvation Army of the bequest and devise in its favor after Lowe's funeral but that he never had any contact or communication with the Salvation Army concerning Lowe's will prior to or on June 3, 2015 or between that date and the funeral. The local Salvation Army Captain was unaware of the bequest and devise prior to when Fugate communicated the information to him.

When asked about her objection to Lowe's 2015 will, Kuncl testified that she did not understand why he would create a new will in 2015 when he supposedly had a prior will drafted by her father. Kuncl testified to her belief that Lowe would have given some of his estate to other entities, including his church and other community organizations with which he was involved. She admitted, however, that she never talked to Lowe about his estate plans. And, she had never seen the prior will and was not aware of its contents or whether there were any differences in the dispositive provisions in the two wills. Kuncl did not know why Lowe made the Salvation Army his sole beneficiary, simply describing it as "weird," and she was unable to identify anything concerning done by the Salvation Army in regards to Lowe's making or executing the 2015 will. Kuncl owns half of the family tree farm by virtue of her father's passing, and she expressed concern about Lowe having left his share to an entity outside of the family, describing the property as "very meaningful to us." She testified that the family spent a lot of time on the property, although she acknowledged that she has not lived in Nebraska since 1964.

Since her parents' deaths in 1996, Kuncl has only visited Nebraska approximately 15 to 17 times, each time for about a week, during which time she would stay at a hotel. Kuncl's last

in-person visit with Lowe was in approximately 2010. After that time, her contact with Lowe was by telephone, and she testified that she spoke to him on most Fridays.

Kuncl claimed that Lowe's will should not be probated because of his advanced age and his physical and mental condition. Upon further inquiry about Lowe's condition, Kuncl could not specifically state when he had lymphoma, when he reached remission, or whether he had been diagnosed with congestive heart failure. Kuncl agreed, however, that Lowe had been a "pretty healthy guy" prior to being diagnosed with lymphoma. She also agreed that after going into remission, Lowe regained weight and returned to "being a pretty healthy guy" and that he did not take much medication, although this was not something he really discussed with her. Specifically, she agreed that from 2005 to June 3, 2015, Lowe's health was "[p]retty good" and that he was a "[h]ealthy guy." Kuncl testified that she had noticed Lowe repeating information in their phone conversations and that he would sometimes tell her something that was "kind of off the wall" or "strange." She stated that it was "not often" that he would say something strange and that this occurred "[m]ore toward the end," although she was unable to clearly specify the exact time frame for this behavior. Upon questioning, Kuncl was unable to identify any direct evidence that Lowe was coerced or unduly influenced by anyone at the Salvation Army to make or execute the 2015 will. And, she acknowledged that she recognized Lowe's signature on the will.

After her grandparents died in 1996, Beall visited Lowe in North Platte approximately once a year until 1998 and then approximately 15 times between 1998 and 2017. Starting in 2004, she would also speak to Lowe on the phone on most Tuesdays for between 2 and 20 minutes per call. Beall testified that Lowe would sometimes repeat information or change topics in the middle of a conversation, and she noted an instance in 2016 when he mistook her fiance for Montgomery, although Lowe recognized this mistake during the course of the conversation. During that same visit in 2016, Lowe directed Beall's fiance to the wrong driveway (within 50 to 100 yards of the correct driveway) when going to the family tree farm. According to Beall, however, between 1996 and her last conversation with him on October 24, 2017, Lowe never reached a point where he forgot what he owned and or who his family was. Beall has never seen someone impose their will on Lowe.

Beall testified about her discussion with Kuncl with respect to Lowe's estate. She wondered why Lowe did not leave something to "the senior center" or his church. Beall also thought that Lowe would have also given something to the Veteran's Memorial or one of the many other community organizations with which he was involved. Like Kuncl, Beall expressed her belief that the tree farm should stay in the family. She testified that sometime between 2000 and 2005, Lowe told her that he had a will in a safe at the office he shared with his brother, but she indicated that they did not discuss the details of his estate plans. She did not know if a will was actually located in that safe.

Beall did not speak with Lowe on June 3, 2015, and she did not know anything about his mental or physical state on that date. She admitted that she did not have any evidence that Lowe lacked the ability to execute a will on that date or any evidence relating to whether Lowe was coerced or pressured to execute a will on that date. And, she did not know whether anybody on behalf of the Salvation Army had any communications with Lowe directing that he execute the will. As did her mother, she acknowledged that she recognized Lowe's signature on the 2015 will.

The district court received the deposition of James R. Nisley offered by Kuncl at the summary judgment hearing. Nisley is a North Platte resident who practiced law for approximately 40 years and had known of Lowe since he was a child and "became more engaged with him" after returning to North Platte to practice law as an adult. Between 2005 and 2015, Nisley had monthly contact with Lowe at Elks meetings, and he visited Lowe in the nursing home prior to Lowe's death. With respect to Lowe's mental status, Nisley testified, "I never questioned his competency. . . . what I saw from [Lowe] is that . . . he understood. . . . I think if you'd asked him on the day he died how much money he had, he'd probably tell you down to the next penny." Nisley did wish, however, that Lowe had entered the nursing home sooner.

As noted above, the district court did not receive the affidavit of Kuncl's expert, Kimzey. For purposes of our analysis, we note certain information from Kimzey's affidavit. Kimzey is a resident of North Platte and employed as a clinical psychologist licensed in Nebraska. Kimzey stated that he had reviewed a substantial amount of information concerning the case but still had more material to review. Based upon his "initial review" and "upon a reasonable certainty within his profession," Kimzey stated that Lowe "may have lacked testamentary capacity on the date of the execution of his [2015 Will]." In support of this statement, Kimzey listed the following: "four (4) welfare checks initiated on [Lowe] prior to the execution of his [2015 will]"; (2) Brittan's "medical notes prior to the execution of his [w]ill indicating that Lowe 'obviously cannot care for himself'"; the "incorrect assertion in [Lowe's 2015 will] of his relatives, under . . . 'Family Information'"; an attached letter from Nisley to Kuncl dated June 25, 1997, which Kimzey described as "questioning [Lowe's] competency"; and Lowe's responses in an attached deposition from May 2013 taken by Fugate.

On April 8, 2020, the district court entered a detailed order, granting Fugate's motion for summary judgment. First, the court addressed Fugate's objection to the receipt of Kimzey's affidavit, sustaining his objections and excluding the affidavit from evidence. The court observed that Kuncl was under a continuing duty to supplement her answers to Fugate's interrogatories. Based on evidence adduced at the summary judgment hearing, the court concluded that "[r]easonable inferences" could be drawn that Kuncl secured Kimzey in advance of the hearing and that despite Fugate's discovery requests, Kuncl failed to seasonably supplement her answers and disclose Kimzey as her expert. The court also noted that Kuncl failed to file the required index of evidence and did not provide Kimzey's affidavit to Fugate until the day of the hearing. The court excluded Kimzey's affidavit from evidence as a sanction for Kuncl's noncompliance.

Next, the district court addressed the issue of Lowe's testamentary capacity. The court found that Fugate established prima facie evidence of Lowe's testamentary capacity because the will was a self-proved will. The court then reviewed the rest of the evidence on this issue and found no material issues of fact sufficient to question Lowe's testamentary capacity. The court observed that neither Kuncl nor Beall was able to provide the court with "any indication or impression of [Lowe's] state of mind on the day he executed his will" and that the admissible evidence presented by Kuncl "consisted of factually unsupported theories, guesses, speculations and/or conjectures." In contrast, the court observed that Fugate presented a "plethora of credible evidence" from multiple witnesses that Lowe possessed testamentary capacity at the time he

executed his will. The court also noted that Kuncl and Beall did not dispute the validity of Lowe's signature on the will.

Finally, the district court found no material issues of fact sufficient to establish undue influence. The court stated that both Kuncl and Beall "were patently unable to provide any material facts" to show that Lowe was subject to undue influence. It specifically noted that Kuncl "unequivocally testified that she doesn't believe any member from Salvation Army influenced [Lowe]," as well as Beall's testimony that she had "no evidence that the Salvation Army or its members had any communication with [Lowe] regarding the preparation and execution of his June 3, 2015 will." In contrast, the court noted the evidence establishing that Lowe was a Salvation Army board member and "an advocate for the Salvation Army in North Platte" and that he was known to be a "community service oriented person."

Kuncl subsequently filed a motion to alter or amend, addressing the district court's exclusion of Kimzey's affidavit, which the court denied on May 12, 2020.

## III. ASSIGNMENTS OF ERROR

Kuncl asserts, restated, that the district court erred in (1) finding no material issues of fact with respect to Lowe's testamentary capacity or the question of undue influence and (2) excluding certain evidence as a discovery sanction.

## IV. STANDARD OF REVIEW

An appellate court reviews the district court's grant of summary judgment de novo, viewing the record in the light most favorable to the nonmoving party and drawing all reasonable inferences in that party's favor. *Fuelberth v. Heartland Heating & Air Conditioning*, 307 Neb. 1002, 951 N.W.2d 758 (2020). An appellate court will affirm a lower court's grant of summary judgment if the pleadings and admitted evidence show that there is no genuine issue as to any material facts or as to the ultimate inferences that may be drawn from those facts and that the moving party is entitled to judgment as a matter of law. *Id.*

The determination of an appropriate discovery sanction rests within the discretion of the trial court, and an appellate court will not disturb it absent an abuse of discretion. *Charles Sargent Irr. v. Pohlmeier*, 27 Neb. App. 229, 929 N.W.2d 527 (2019). A judicial abuse of discretion exists if the reasons or rulings of a trial judge are clearly untenable, unfairly depriving a litigant of a substantial right and denying just results in matters submitted for disposition. *Grothen v. Grothen*, 308 Neb. 28, 952 N.W.2d 650 (2020).

## V. ANALYSIS

### 1. SUMMARY JUDGMENT

Kuncl argues that she produced evidence showing material issues of fact with respect to Lowe's testamentary capacity and the question of undue influence and that the district court erred in finding otherwise. Summary judgment is proper when the pleadings and the evidence admitted at the hearing disclose that there is no genuine issue as to any material fact or as to the ultimate inferences that may be drawn from those facts and that the moving party is entitled to judgment as a matter of law. *Kaiser v. Allstate Indemnity Co.*, 307 Neb. 562, 949 N.W.2d 787 (2020). The party

moving for summary judgment must make a prima facie case by producing enough evidence to show that the movant is entitled to judgment if the evidence were uncontroverted at trial. *Dondlinger v. Nelson*, 305 Neb. 894, 942 N.W.2d 772 (2020). If the party moving for summary judgment makes a prima facie case, the burden shifts to the nonmovant to produce evidence showing the existence of a material issue of fact that prevents judgment as a matter of law. *Id.*

(a) Testamentary Capacity

In a contested case, the proponents of a will have the burden of establishing prima facie proof of testamentary capacity. *In re Estate of Clinger*, 22 Neb. App. 692, 860 N.W.2d 198 (2015), *affirmed* 292 Neb. 237, 872 N.W.2d 37. Prima facie proof of a testator's testamentary capacity is established by the introduction of a self-proved will. *Id.* Prima facie proof of a testator's testamentary capacity is rebuttable with competent evidence to the contrary. *Id.*

The evidence is undisputed that Lowe's 2015 will was self-proving. See Neb. Rev. Stat. § 30-2329 (Reissue 2016). Accordingly, the burden shifted to Kuncl to establish that Lowe lacked testamentary capacity at the time he signed the will.

One possesses testamentary capacity if she understands the nature of her act in making a will or a codicil thereto, knows the extent and character of her property, knows and understands the proposed disposition of her property, and knows the natural objects of her bounty. *In re Estate of Clinger, supra*. Testamentary capacity is tested by the state of the testator's mind at the time the will or codicil is executed. *In re Estate of Peterson*, 232 Neb. 105, 439 N.W.2d 516 (1989).

In support of her arguments with respect to Lowe's testamentary capacity, Kuncl relies on the fact that the will identifies Montgomery as Lowe's nephew and the fact that he mistook Beall's fiance for Montgomery on one occasion. She also cites evidence of his condition in 2004 when he was suffering from lymphoma, certain evidence referenced in the excluded affidavit of Kimzey, Lowe's confusion on occasions when he was admitted to the hospital in 2017, and concerns expressed by Kuncl, Beall, and Nisley about Lowe toward the end of his life. She also cites the fact that Lowe directed Beall's fiance to turn in at the wrong driveway when going to the tree farm as evidence that Lowe did not know the character and extent of his property.

Some of the evidence relied on by Kuncl was not admitted into evidence. Other evidence, such as the driveway incident and the mistaking the identity of Beall's fiance occurred in 2016, after the will was executed. The record shows that Lowe recognized his mistake about the fiance's identity during the same conversation. And, we disagree that directing someone to the wrong driveway was evidence that Lowe did not know the character and extent of his own property. Again, this incident occurred sometime after the will was executed. None of the evidence relied on by Kuncl creates a material issue of fact with respect to Lowe's testamentary capacity at the time the will was executed in June 2015. Conclusions based on guess, speculation, conjecture, or a choice of possibilities do not create material issues of fact for purposes of summary judgment. *Dondlinger v. Nelson*, 305 Neb. 894, 942 N.W.2d 772 (2020). The district court did not err in finding no material issues of fact with respect to Lowe's testamentary capacity.

(b) Undue Influence

By statute, contestants of a will have the burden of establishing undue influence and carry the ultimate burden of persuasion. *In re Estate of Clinger*, 292 Neb. 237, 872 N.W.2d 37 (2015). See, also, Neb. Rev. Stat. § 30-2431 (Reissue 2016). To show undue influence, a will contestant must prove the following elements by a preponderance of the evidence: (1) The testator was subject to undue influence, (2) there was an opportunity to exercise such influence, (3) there was a disposition to exercise such influence, and (4) the result was clearly the effect of such influence. *In re Estate of Barger*, 303 Neb. 817, 931 N.W.2d 660 (2019). Undue influence sufficient to defeat a will is manipulation that destroys the testator's free agency and substitutes another's purpose for the testator's. *In re Estate of Clinger, supra*.

Because undue influence is often difficult to prove with direct evidence, it may be reasonably inferred from the facts and circumstances surrounding the actor: his or her life, character, and mental condition. *In re Estate of Barger, supra*. Suspicious circumstances, when coupled with proof of a confidential or fiduciary relationship, that have indicated an instance of undue influence include (1) a vigorous campaign by a principal beneficiary's family to maintain intimate relations with the testator, (2) a lack of advice to the testator from an independent attorney, (3) an elderly testator in weakened physical or mental condition, (4) lack of consideration for the bequest, (5) a disposition that is unnatural or unjust, (6) the beneficiary's participation in procuring the will, and (7) domination of the testator by the beneficiary. *Id.*

In support of her argument that Lowe was unduly influenced, Kuncl cites the fact that she and Beall and Lowe spent a lot of time on the tree farm, which had been in the family for almost 100 years. She argues that this leads to an inference that Lowe "would have felt a duty to leave his share of the family farm, of which [Kuncl] already owns half, to someone in his family." Brief for appellant at 20. She argues that leaving his share to the Salvation Army is "an unnatural provision, inconsistent with his duty to members of his family." Brief for appellant at 21. She also cites to the friendship between Fugate and Lowe, which she argues could have allowed Fugate to exercise undue influence on the part of the beneficiary. Finally, she cites Lowe's age and his battle with lymphoma.

Kuncl relies largely on speculation and conjecture and points to no actual evidence of undue influence. The record shows that Lowe was heavily involved in community service and that the Salvation Army was one of the organizations with which he was involved. Both Kuncl and Beall agreed that they had no evidence of undue influence by the beneficiary, the Salvation Army. The district court did not err in finding no material issues of fact with respect to the question of undue influence.

## 2. DISCOVERY

Kuncl asserts that the district court erred in excluding certain evidence as a discovery sanction, specifically, the affidavit of her expert, Kimzey. The court excluded the affidavit due to Kuncl's failure to supplement her discovery responses and identify Kimzey as an expert who would be testifying pursuant to Neb. Ct. R. Disc. § 6-326 and her failure to file an index of evidence as required by Neb. Ct. R. § 6-1526. The court did not abuse its discretion in doing so.

The primary purpose of the discovery process is the exploration of all available and properly discoverable information to narrow the fact issues in controversy so that a trial may be an efficient and economical resolution of a dispute. *Phillips v. Monroe Auto Equip. Co.*, 251 Neb. 585, 558 N.W.2d 799 (1997). The discovery process also provides an opportunity for pretrial preparation so that a litigant may conduct an informed cross-examination. *Paulk v. Central Lab. Assocs.*, 262 Neb. 838, 636 N.W.2d 170 (2001). Moreover, pretrial discovery enables litigants to prepare for a trial without the element of an opponent's tactical surprise, a circumstance which might lead to a result based more on counsel's legal maneuvering than on the merits of the case. *Id.*

Under § 6-326(e)(1)(B), there is an explicit duty to seasonably supplement a response to a request for discovery directed toward identity of an expert witness expected to be called at trial, the subject matter of expected testimony from such expert, and the substance of the expert witness' expected testimony. *Norquay v. Union Pacific Railroad*, 225 Neb. 527, 407 N.W.2d 146 (1987). As a consequence of § 6-326(e) and within the purview of that rule, a litigant has the right to have interrogatories answered and the continuing duty to supplement answers previously given in response to an adversary's interrogatories. See *id.* See, also, *Eddy v. Builders Supply Co.*, 304 Neb. 804, 937 N.W.2d 198 (2020) (party has right to have interrogatories answered, and duty to supplement answers previously given in response to adversary's interrogatories is continuing duty).

A party's failure to answer properly served interrogatories or to seasonably supplement discovery responses may be grounds for sanctions imposed under Neb. Ct. R. Disc. § 6-337. *Eddy v. Builders Supply Co., supra*. To avoid sanctions under § 6-337, an interrogated party must either answer or object to the interrogatories or move for a protective order relieving the interrogated party from answering the interrogatories. *Eddy v. Builders Supply Co., supra*. Sanctions under § 6-337 exist not only to punish those whose conduct warrants a sanction but to deter those, whether a litigant or counsel, who might be inclined or tempted to frustrate the discovery process by their ignorance, neglect, indifference, arrogance, or, much worse, sharp practice adversely affecting a fair determination of a litigant's rights or liabilities. *Eddy v. Builders Supply Co., supra*.

An appropriate sanction under § 6-337 is determined in the factual context of a particular case and is initially left to the discretion of the trial court, whose ruling on a request for sanction or a sanction imposed will be upheld in the absence of an abuse of discretion. *Eddy v. Builders Supply Co., supra*. In determining whether to exclude testimony of an expert witness called by a party who has failed to comply with a request for discovery, the trial court should consider the explanation, if any, for the party's failure to respond, or respond properly, to a request for discovery concerning an expert witness, importance of the expert witness' testimony, surprise to the party seeking preclusion of the expert's testimony, needed time to prepare to meet the testimony from the expert, and the possibility of a continuance.

Here, Fugate sent discovery requests to Kuncl in 2018, one of which asked her to identify any experts she intended to call to testify. Kuncl responded that she had not yet made a final determination with respect to any expert witness but that she would supplement her answer when she had done so. Then in her April 2019 deposition, Kuncl was again asked to disclose the identity of any expert witness she might call to testify regarding the issues of testamentary capacity and

undue influence. Kuncl replied that no expert had been retained, but her counsel commented that Kimzey had been consulted, although he had not reviewed any documents. Kuncl did not file any supplement to her previous discovery responses. On January 2, 2020, Fugate filed the motion for summary judgment and his index of supporting evidence; the hearing was scheduled for January 27. Kuncl still did not supplement her responses, and she did not file her own required index of opposing evidence.

In analyzing this issue, the district court determined that a reasonable inference could be drawn that Kuncl had in fact secured an expert in advance of the hearing whom she intended to use at the hearing. It reasoned that her decision not to disclose this fact in advance of the hearing precluded Fugate from inquiring and learning about the substance of Kimzey's opinions. The court observed that the discovery phase of this case involved written discovery and a series of depositions over a considerable period of time, and which took place in different locations, including Ohio. The court reviewed Nebraska case law concerning discovery sanctions, and then it excluded Kimzey's affidavit.

Kuncl argues that the district court should have considered her explanation made at the hearing that Kimzey had only been recently retained due to his illness and that there was a lack of surprise given that the things Kimzey relied on were known to the parties and disclosed during discovery. She also asserts that the court should have considered a continuance. During the hearing Kuncl's counsel asked the court "either to continue the hearing" so that he could prepare an index of evidence and resubmit the affidavit or that the court "can hear the hearing on the merits today, and allow me some time to respond and reply" to the summary judgment motion." He also argued that they had only retained Kimzey the week prior and were under no duty to disclose before that as they were only consulting with him.

Kuncl's attorney did not clearly request a continuance or insist on a ruling; nor has Kuncl assigned any error to any implicit denial of the request. There was no explanation given for why discovery was not supplemented at the point when Kimzey was retained as an expert, which clearly occurred before the day of the hearing. The district court did not abuse its discretion in excluding the affidavit.

## VI. CONCLUSION

The district court did not err in granting summary judgment in Fugate's favor. The court did not abuse its discretion in excluding Kimzey's affidavit as a discovery sanction.

AFFIRMED.